**EASTERN MOTOR EXPRESS, Inc. et al. v. UNITED STATES et al.**

Civ. A. No. 2825.

United States District Court
S. D. Indiana, Indianapolis Division.

Feb. 11, 1952.

696

Howell Ellis, Indianapolis, Ind., Milton E. Diehl, Washington, D. C., for Eastern Motor Express, Inc.

Walter F. Jones, Jr., Public Counsellor, Indianapolis, Ind., for Public Service Commission State of Indiana.

Charles W. Bucy, Associate Solicitor, Henry A. Cockrum, Washington, D. C., for Department of Agriculture.

Nuel D. Belnap, Robert N. Burchmore, John S. Burchmore, and Walter, Burchmore & Belnap, all of Chicago, Ill., for the National Industrial Traffic League.

John F. Baecher, John H. D. Wigger, and John E. Kilday, Sp. Assts. to the Atty. Gen., H. G. Morison, Asst. Atty. Gen., Marshall E. Hanley, U. S. Atty., Indianapolis, Ind., for the United States.

E. M. Reidy, Associate Chief Counsel, Interstate Commerce Commission, S. R. Howell, Asst. Chief Counsel, Intrastate Commerce Commission, Washington, D. C., and Daniel W. Knowlton, Chief Counsel, Interstate Commerce Commission, Washington, D. C., for Interstate Commerce Commission.

Charles Clark, Washington, D. C., Joseph F. Johnston, Birmingham, Ala., Frank W. Gwathmey, Washington, D. C., Joseph H. Hays, Chicago, Ill., James W. Nisbet, Chicago, Ill., R. T. Wilson, Jr., Richmond, Va., Carl Helmetag, Jr., Philadelphia, Pa., Clifford O. Shandy, Terre Haute, Ind., for Intervening Railroads.

Burton K. Wheeler, Edward K. Wheeler, Wheeler & Wheeler, and J. Albert Woll, all of Washington, D. C., for International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America.

Franklin R. Overmyer and Petit, Olin, Overmyer & Fazio, all of Chicago, Ill., for Intervening Truck Lines.

Before KERNER, Circuit Judge, and PLATT and STECKLER, District Judges.

KERNER, Circuit Judge.

■ Twenty-one motor common carriers operating under the authority of the Interstate Commerce Commission, 49 U.S.C.A. Chap. 8, § 301 et seq., brought suit to enjoin enforcement of an order of the Commission prescribing a new set of rules intended to regulate practices of motor common and contract carriers related to leasing and interchange of vehicles. A special court of three judges was convened pursuant to statute, 28 U.S.C.A. §§ 2284(1) and 2325, to hear and determine the application. The United States Secretary of Agriculture, the Public Counselor of Indiana, and the National Industrial Traffic League were granted leave to intervene in support of the complaint, and the Teamsters' Union, substantially all of the Class I railroads of the United States, and a number of certificated carriers serving points in the Chicago suburban area and in six states of the North Central area, in opposition. The matter was heard on the pleadings and record made before the Commission and the briefs and argument of counsel. Motion of plaintiffs for leave to adduce additional evidence pertaining to the value of their property and rights and the effect of the order thereon was denied. New York v. United States, 331 U.S. 284, 335, 67 S.Ct. 1207, 91 L.Ed. 1492.

The proceeding which culminated in the promulgation of the rules now challenged by plaintiffs was instituted on January 9, 1948. At that time the Commission issued the requisite notice of proposed rule making stating that an investigation would be made pursuant to the Interstate Commerce Act into the lawfulness of certain practices of authorized carriers with respect to their use of nonowned equipment in the performance of transportation. There was attached to the notice a tentative set of rules representing a composite of the views and recommendations of various parties interested in the situation. Extensive hearings were held before an examiner. These hearings were participated in by numerous associations of common and contract carriers, individual carriers and shippers, owners and operators of vehicles under lease to carriers, the Teamsters' Union, the Railway Express Agency, the railroads, the Bureau of Motor Carriers, the regulatory bodies of nine states, and others. The examiner filed his report recommending the adoption of certain rules governing leasing and interchange of vehicles; exceptions were filed; and Division 5 of the Commission, charged with the handling of motor vehicle cases, issued its report. 51 M.C.C. 461. Upon petitions for reconsideration, the proceeding was reopened and argument had before the entire Commission which thereafter issued its report and entered the order here complained of. 52 M.C.C. 675.

In its report the Commission stated that the proceeding had arisen because of a practice which antedated the Motor Carrier Act of 1935 and undoubtedly was more prevalent in the motor-carrier industry than in any other field of transportation, i. e., the use of nonowned vehicles in their operations by those holding authority as carriers. To a great extent the ownership in such cases was vested in individuals generally known as owner-operators who either drove their vehicles themselves or hired others to drive them. The Commission had initiated a study of conditions and practices prior to the war. However, as it stated in its report, "During the war, directives of the Office of Defense Transportation, and our orders, designed to require the maximum use of motor-vehicle capacity, and the conservation of fuel and tires, while not authorizing transportation by persons lacking appropriate authority, sanctioned many practices that were permissible only because of the emergency. As a result, leasing among authorized carriers became more prevalent and widespread. After the war, because of the desire of many veterans to engage in business for themselves, the ease with which they could obtain financial aid in buying equipment and the difficulty of entering a regulated industry, leasing practices, particularly the employment of owner-operators, have greatly increased."

After the emergency directives and orders were cancelled, complaints regarding leasing practices continued. The Commission found that in many cases leasing of vehicles resulted in unlawful extensions of

the carriers' operating authority. Where authorized carriers leased the equipment of non-certificated carriers, many violations of the Act occurred with respect to the inspection and safety rules for drivers and equipment. The Commission found that in the case of short term leases, and more particularly the so-called "trip lease," the arrangements between the authorized carrier and the owner-operator were so informal as to make it impossible to fix responsibility to the shipper or the public. Such arrangements were frequently oral, and even made over the telephone, without inspection of the vehicle or any attempt to ascertain whether the driver was in fact qualified to operate it. They were sometimes completed after the transportation had already taken place. In the case of the single-haul trip lease, the carrier was under no obligation to the owner-operator after completion of the one-way haul, and assumed no responsibility for the return trip. Since some of the owner-operators did not carry public liability or property damage insurance or were unable to obtain it, protection for the public might be entirely lacking. And in such instances, the opportunity was presented for the owner-operator to engage in unlawful transportation. The Commission found that it was a not uncommon practice for haulers of exempt commodities (farm and other food products) to obtain traffic through direct solicitation of a shipper and then to contact some authorized carrier having appropriate authority who would pay the highest compensation, and validate the transaction through a trip lease; although such arrangements were clearly illegal, it was very difficult for the Bureau charged with supervision of the traffic to obtain evidence of them. The Commission also found that falsification of drivers' logs in order to cover up violations of safety regulations frequently occurred.

In addition to the serious dangers resulting to or likely to result to the public from the general disregard of safety and inspection rules, the Commission also pointed to unhealthy economic conditions in the industry resulting from the leasing system. It found that owner-operators in certain industrial centers were interested only in truckload traffic and had been responsible for numerous reduced rates tending to cause a deterioration in the rate structure in the territory. And the method of payment used by many authorized carriers to compensate owner-operators for use of their vehicles on a percentage of the gross revenue derived from the transportation performed led the carriers which utilized owner-operator equipment to concentrate upon the profitable traffic to the exclusion of other traffic. This fact, plus the fact of avoidance of normal operating expenses such as maintenance, fuel and others had the effect of distorting the operating statistics of carriers which depended to a large extent upon equipment leased on that basis.

The Commission further found, with respect to leasing and interchange practices, that a number of carriers conducted their operations wholly or in part in leased equipment and, with minor exceptions, contended that trip leasing was an economic necessity. Certain of the vehicles operated by the authorized carriers under short term or trip leases were vehicles which transported exempt agricultural commodities to market and were used by the carriers on the return trip to transport non-agricultural commodities from distribution centers to the agricultural sections of the nation. For example, the Commission made the following statement as to the Florida traffic: "The record indicates that the interstate common carriers serving Florida generally do not transport perishable fruits and vegetables northbound, apparently because of the lack of adequate equipment and operating authorities that are restricted either as to routes or territory. Almost 100% of this traffic is transported in vehicles of dealers or carriers that specialize in transporting such commodities exclusively and have refrigerated or semirefrigerated equipment. The Florida agricultural industry is said to be dependent on the service, and we are urged by the Florida Railroad and Public Utilities Commission, and the Florida Citrus Commission, as well as other bodies representing Florida growers and shippers of perishable products, to adopt no regulations that would preclude the use of the equipment of the exempt carriers for the

south-bound transportation of general commodities under lease. * * * The common carriers domiciled in the North, which have rights to serve Florida, either directly or through interchange, lack equipment to transport the perishable commodities on return trips, and apparently are willing to have a good share of the south-bound traffic transported under lease by the exempt carriers in order to avoid empty return movements from the South. Clearly, this is not a healthy condition from the standpoint of regulation. The transportation of general commodities should be performed by authorized carriers."

The Commission further found that certain railroads having authority to perform motor-truck operations along their rail lines in the transportation of railroad freight between rail stations perform such service in vehicles leased from others who also furnish the drivers, under long-term contracts or continuing agreements. With respect to this the Commission stated: "In general, the terms of the contracts between the railroads and their lessors are as follows: The lessor is required to furnish competent and qualified drivers of the leased vehicles, which are the employees of the lessor and not the employees of the railroad. The railroad may request removal or discharge of an objectionable driver. Representatives of the railroad prescribe the schedules, routes, records, and methods of handling freight, and only railroad employees deal with the public. The vehicles furnished must meet railroad specifications, and be maintained in good working order, and the lessor is required to provide public-liability and property-damage insurance coverage. The name of the railroad is painted on the vehicles, which must conform to our safety regulations, and to State and Federal laws, and must be operated solely for the purpose of transporting railroad freight, or that which the railroad directs to be transported. The lessor is required to file accident and hours-of-service reports and to comply with safety regulations."

For the foregoing reasons, the Commission found that no necessity existed for applying the rules and regulations in the case of coordinated rail-motor and express service and accordingly exempted vehicles used in such service from the operation of the rules.

With respect to interchange of equipment, the Commission found that while it does not present as serious a problem as that of leasing, many parties to the proceeding advocated the prescription of reasonable rules and regulations governing interchange practices in order to stop those detrimental to the industry.

In summary, the Commission found that many practices indulged in by authorized carriers in leasing equipment had facilitated violations and evasions of law and of the Commission's regulations then in effect and militated against sound regulation of motor carriers, and that enforcement of existing regulations would not render unnecessary the prescription of rules and regulations governing leasing and interchange of equipment; that there were many arrangements which were on the border line between unlawful practices and those that had been permitted for lack of any definition of legal leasing although not always approved; that under existing conditions it was obviously impossible for its enforcement staff to advise carriers respecting leasing arrangements which were lawful and those which were unlawful, and that the carriers themselves had no guide as to the practices which were legal.

The Commission rendered the following ultimate findings: "We find, upon consideration of all the evidence of record, that evasions and violations of the provisions of part II of the act, and of our regulations prescribed thereunder, occur in the present practices of motor common and contract carriers of property that are subject to such provisions in augmenting their motor-vehicle equipment other than by purchase, and in interchanging equipment; that it is necessary in order properly to administer, execute, and enforce such provisions and the regulations thereunder, that reasonable rules and regulations be prescribed governing the lease and interchange of such equipment by such carriers; and that the rules and regulations set forth in appendix E hereto are, and for the future will be, reasonable, and should be prescribed for ob-

servance by such carriers. The findings in the prior report of division 5 are modified accordingly. An appropriate order prescribing for the future the reasonable rules and regulations set forth in appendix E to the report will be entered."

█ The effective date of the order has been postponed from time to time by the Commission pending determination of suits here and in other jurisdictions to set it aside. One such suit was decided by a three-judge court for the Northern District of Alabama on December 14, 1951, denying the application there filed by a number of truckers' associations and motor common carrier corporations for relief similar to that sought by the 21 plaintiffs before this court. American Trucking Association, Inc., v. United States and Interstate Commerce Commission, D.C., 101 F.Supp. 710. We shall refer to this as the Alabama case. The principal issue there related to the statutory authority of the Commission to make the order complained of. In a very carefully considered opinion the court decided that the Commission was empowered by the provisions of the Interstate Commerce Act to regulate by reasonable rules the manner in which motor carriers procure or provide by lease or interchange the equipment used by them in performing their essential transportation services. The court further held that the procedure followed by the Commission in its hearings culminating in the promulgation of the rules completely satisfied the requirements of the Administrative Procedure Act, with particular reference to notice and hearing, and that the rules prescribed were not arbitrary, capricious or an abuse of discretion. Our study of the case presented to us has been made considerably easier by the excellent analysis of the historical background and legislative scheme of the Motor Carrier Act under the authority of which the present order was issued. We consider it unnecessary to repeat that discussion except to say that under the scheme of the Act the Commission is vested with full authority to regulate so-called common and contract carriers but that a large number of other carriers remained outside the orbit of its control, and "whether the trucking operation is within or without the orbit of economic regulation, the vehicles used are not substantially different."

There appears to have been general agreement among all participants at all stages of the current proceedings as to the necessity for some tightening up of either the regulations governing the use of non-owned equipment or the enforcement of the existing regulations. Many of the motor carriers themselves had been very active in their demands for improvements of then existing conditions which they recognized as detrimental both to the public and to the industry. So it appears to us that the fundamental controversy between the Commission and the complaining carriers revolves about the question of the degree of regulation needed to eliminate the undesirable conditions and practices. As we understand plaintiffs' position, it is that the rules finally promulgated are so drastic as to constitute an unlawful usurpation of authority on the part of the Commission and an impairment of their constitutional guarantees of freedom of contract and property rights. Other objections to the rules will be noted hereafter.

The rules which plaintiffs find most objectionable are contained in the following sections:

§ 207.4 " * * * authorized carriers may perform authorized transportation in or with equipment which they do not own only under the following conditions:

"(a) The contract * * * for the use of such equipment—

* * * * * *

"(3) Shall specify the period for which it applies which shall be not less than 30 days when the equipment is to be operated for the authorized carrier by the owner or employees of the owner * * *

* * * * * *

"(5) Shall specify the compensation to be paid by the lessee for the rental of the leased equipment; provided, however, that such compensation shall not be computed on the basis of any division or percentage of any applicable rate or rates on any commodity * * * transported in said vehicle or on a division or percentage of any

revenue earned by said vehicle during the period for which the lease is effective."

They also complain to a lesser degree of the hampering restrictions on interchange of equipment between authorized carriers by § 207.5 which they say prohibits leasing except where both parties to the lease are authorized to serve both points between which they operate and also limits leasing to carriers of the same type, so that a regular route common carrier could not lease equipment to an irregular route common carrier, nor a contract carrier to a common carrier of any type; and of the exemption by § 207.3(b) of all equipment utilized wholly or in part in the transportation of railway express traffic, or in substituted motor-for-rail transportation of railroad freight moving between points that are railroad stations on railroad billing.

■ Plaintiffs contend that the objectionable provisions of the order are in direct conflict with § 208(a) of the Interstate Commerce Act, 49 U.S.C.A. § 308(a), which prohibits the Commission from imposing conditions restricting the right of the authorized carrier to add to its equipment and facilities within the authorized territories, hence constitute an unlawful usurpation of authority. We think this contention is fully answered by the court in the Alabama case and we reject it for the reasons there stated and on the authority of the cases there referred to.

■ Plaintiffs further contend that the regulations governing lease and interchange jeopardize the national defense in that they prevent maximum utilization of transportation facilities in this time of extraordinary need. They point to the proclamation by the President of the United States on December 16, 1950, of the existence of a national emergency which, they argue, requires the free, unhampered use of all equipment, impossible under the provisions of the Commission's order. And since the purpose clause of the National Transportation Act specifies the national defense as one of the needs to be met in the development of a national system of transportation, they argue that restrictions which prevent maximum utilization of all facilities are invalid. We cannot agree.

Conditions found by the Commission to exist in the industry clearly showed the necessity for curtailing the practices responsible for them. It was shown that some of the very practices sought to be prevented resulted from the same kind of free and unhampered conditions prevailing during and after the last war. If a serious worsening of conditions develops hereafter it may furnish a reason for suspending the operation of the rules under directives similar to those of the Office of Defense Transportation and the orders of the Commission during the war, referred to in the report of the latter. Such directives and orders would presumably be made under proper safeguards of the Commission, compatible with the public safety. Compare American Airlines, Inc., v. Civil Aeronautics Board, D.C.Cir., 192 F.2d 417. We find no grounds for holding the order promulgating the rules invalid on the basis of the proclamation.

Plaintiffs assert that the order jeopardizes the national economy in prohibiting the use of vehicles transporting exempt agricultural commodities in one direction for return trips as a part of the motor-vehicle fleet of common carriers. In this they are joined by the Secretary of Agriculture who participated in the hearings before the Commission. His opposition to the order was principally based on the theory that the rules "virtually nullify the agricultural exemptions contained in §§ 203(b)(4a), (5) and (6) of the Interstate Commerce Act, 49 U.S.C.A. 1946 ed. § 303(b)(4a), (5) and (6); * * *." Section 203(b) provides that, except for safety and inspection provisions vehicles controlled and operated by: (4a) any farmer when used in the transportation of his agricultural commodities or supplies to his farm, (5) an agricultural cooperative association or federation of such, or (6) vehicles used in carrying livestock, fish or agricultural commodities if not used in carrying any other property or passengers for hire, shall be exempt from the operation of the Act. It appears that what plaintiffs, including the Secretary, are seeking as to this point is to invalidate the entire order with respect to trip leasing because, they assert, vehicles exempted by

statute are not excluded from the operation of the rules. And yet the statute itself limits the exemption solely to vehicles *when used* for the carriage of food stuffs or farm supplies or if not used in carrying other property or passengers for hire.

■ The Secretary argues on the basis of custom and expediency that discontinuance of the trip-leasing practice which had been engaged in for many years would result in restricting the distribution of the products of agriculture, increasing the mileage operated without cargo by both Commission-regulated carriers and the transporters of agricultural commodities and farm supplies, and charging of higher transportation costs to the public in order to compensate both types of carriers for the increased "cargoless" mileage. This may all be true, but it is an argument which must be addressed to the Congress. Perhaps Congress might find the answer in removing the exemption entirely from the long-haul, large-scale fleet operations discussed by the Secretary in his brief in which he refers to the testimony as to comparative numbers. "According to Commissioner John L. Rogers there were in the United States on February 1, 1950, approximately 40,000 haulers of agricultural commodities, farm supplies, and fish operating in interstate commerce (owning 150,000 exempt trucks) as compared to 20,042 Commission-regulated carriers of property." Far from justifying the continuation of the system as developed, we are of the opinion that this evidence further points up the necessity for the stricter regulation which will result from the operation of the new rules, in view of the record in this case and the findings by the Commission of the serious evils which have resulted from the unregulated trip-leasing practices of the past, including those of the exempt commodity carriers. It is clear from the record that the Commission gave the matter very careful consideration before concluding that trip leasing of vehicles operated by private or exempt carriers was not consistent with regulation and should be prohibited. We cannot agree that the order nullifies the agricultural exemption.

■■ Plaintiffs further contend that the order is invalid for failure of the Commission to follow the provisions of the Administrative Procedure Act, with particular reference to the burden of proof on the proponent of a rule or order. 5 U.S.C.A. § 1006(c). The tentative rules attached to the original notice of proposed rule making were, as previously stated, a composite of rules proposed by various interested groups and parties and were, in some cases, in conflict. Full hearing on conditions, general and particular, demonstrated the necessity for further regulation to curb the undesirable or even illegal practices disclosed, and indicated the particular rules best calculated to remedy conditions from among all those proposed or recommended by the various parties. Thereafter the task of the Commission was one of revision and promulgation, based on its own findings as supported by the evidence. We think the record discloses ample compliance with all requirements of the Administrative Procedure Act including that of the burden of proof.

■ The last issue, which plaintiffs assert was not presented to or decided by the court in the Alabama case, is whether the order impairs constitutional guarantees of contract and property rights. As to this we deem it necessary to refer only to the classic statement in Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 228, 20 S.Ct. 96, 102, 44 L.Ed. 136: "The power to regulate interstate commerce is, as stated by Chief Justice Marshall, full and complete in Congress, and there is no limitation in the grant of the power which excludes private contracts of the nature in question from the jurisdiction of that body. Nor is any such limitation contained in that other clause of the Constitution which provides that no person shall be deprived of life, liberty or property without due process of law. * * * the power of Congress to regulate interstate commerce comprises the right to enact a law prohibiting the citizen from entering into those private contracts which directly and substantially * * * regulate to a greater or less degree commerce among the States."

Plaintiffs argue that this case is not applicable here for the reason that the contracts inhibited by the order of the Commission are in fact in the furtherance of the free flow of interstate commerce instead of in restraint thereof. We cannot agree. It is for the Commission, under its broad regulatory power, to determine what properly furthers the free flow of commerce and what unduly restrains it. The Commission has spoken and, we repeat, its findings are amply supported by the record. It is not for us to say that its order, based thereon, is invalid. National Broadcasting Co. v. United States, 319 U.S. 190, 225, 63 S.Ct. 997, 87 L.Ed. 1344.

In conclusion we find that: 1. The Commission had jurisdiction to promulgate rules regulating leasing and interchange of equipment by carriers operating under its authority; 2. the Commission complied with the requirements of the Administrative Procedure Act in promulgating its order; 3. the evidence before the Commission amply supports its findings as to the necessity for further regulation with respect to the practices under investigation; 4. the rules were not arbitrary, capricious or discriminatory, and did not improperly interfere with plaintiffs' contract and property rights; and 5. the order was not based on mistake of law or misapplication of proper statutory standards.

It follows that plaintiffs are not entitled to the injunction sought by their bill of complaint and the suit must be, and it is hereby dismissed.