## AMERICAN TRUCKING ASSOCIATIONS, INC. ET AL. *v.* UNITED STATES ET AL.

NO. 26.

Argued November 17–18, 1952.—Decided January 12, 1953.

*Harry E. Boot* and *Wilbur M. Brucker* argued the cause for appellants in No. 26. On the brief were *Mr. Boot* and *Peter T. Beardsley* for the American Trucking Associations, Inc., *George S. Dixon* for the National Automobile Transporters Association et al., *Herbert Baker* and *Noel F. George* for the Association of Highway Steel Transporters, Inc., *Joseph H. Blackshear* for the Watkins Motor Lines, Inc. et al., *James W. Wrape* for the Gordons Transports, Inc. et al., and *John S. Burchmore* for the National Industrial Traffic League, appellants.

*Howell Ellis* argued the cause for appellants in No. 35. With him on the brief was *Milton E. Diehl.* With them on the Statement as to Jurisdiction was *John S. Burchmore.*

*Neil Brooks* argued the cause for appellant in No. 36. With him on the brief was *W. Carroll Hunter.*

*Ralph S. Spritzer* argued the cause for the United States and the Interstate Commerce Commission, appellees. With him on the brief were *Acting Solicitor General Stern, Acting Assistant Attorney General Clapp* and *Edward M.*

*Reidy. Philip B. Perlman,* then Solicitor General, *Daniel W. Knowlton* and *Mr. Reidy* filed motions to dismiss for the United States and the Interstate Commerce Commission in Nos. 26 and 35.

*Burton K. Wheeler* argued the cause for the Brotherhood of Teamsters-Chauffeurs-Warehousemen & Helpers of America, appellee. With him on the brief were *Edward K. Wheeler, Robert G. Seaks* and *J. Albert Woll.*

*Carl Helmetag, Jr.* argued the cause for the Intervening Railroads, appellees. With him on the brief were *Charles Clark* and *Joseph F. Hays.* With them on a motion to affirm were *Frank W. Gwathmey* and *Joseph F. Johnson* in No. 26.

*Franklin R. Overmyer* argued the cause and filed a brief for the Chicago Suburban Motor Carriers Association et al., appellees.

*Robert N. Burchmore, Nuel D. Belnap* and *John S. Burchmore* filed a brief for the National Industrial Traffic League, appellant in Nos. 26 and 35.

Briefs of *amici curiae* supporting appellants were filed by *Edward R. Adams, Drew L. Carraway* and *Homer S. Carpenter* for the Greyvan Lines, Inc.; and by *Mr. Brucker* and *Harold J. Waples* for the Movers Conference of America.

*Smith Troy,* Attorney General, filed a brief for the State of Washington, as *amicus curiae,* urging affirmance.

MR. JUSTICE REED delivered the opinion of the Court.

These appeals attack new Interstate Commerce Commission rules governing the use of equipment by authorized motor carriers when the equipment is not owned by the carrier but is leased from the owner or obtained by interchange with another authorized carrier. They

were prescribed by the Commission and reported *Ex Parte No. MC–43, Lease and Interchange of Vehicles by Motor Carriers,* 52 M. C. C. 675. As will be seen from the portions we have quoted in the Appendix, *post,* p. 323, they principally require carrier inspection; when the equipment is leased, control for a minimum of thirty days and a method of compensation other than division of revenues between lessor and lessee; and, in the case of use of another carrier's equipment, authorization to the exchange point and actual transfer of control. Thus the practice of using leased equipment and that obtained by interchange is brought into conformity with the regulation of carrier-owned equipment to avoid evils that had grown up in that practice.

Some six suits were instituted to test the validity of the rules in the district courts under 28 U. S. C. §§ 2321–2325. Three were stayed by orders and one was not moved pending disposition of the instant cases.[1] These came here on direct appeal from two separate judgments denying the injunctive relief prayed for; one in the Southern District of Indiana, *Eastern Motor Express, Inc.* v. *United States,* 103 F. Supp. 694, and the other in the Northern District of Alabama, *American Trucking Associations, Inc.* v. *United States,* 101 F. Supp. 710. The issues there considered and resolved against the applicants concerned the Commission's authority under the Motor Carrier Act of 1935, Interstate Commerce Act, Part II, 49 Stat. 543, as amended, 54 Stat. 919, 49 U. S. C. § 301 *et seq.;* the impact of the rules on agricultural trucking and on the guaranteed right of authorized carriers to augment their equipment; the application of the

---

[1] *Oklahoma-Louisiana Motor Freight Corp.* v. *United States* (D. C. W. D. Okla.); *Movers' Conference of America* v. *United States* (D. C. E. D. Mich.); *Greyvan Lines, Inc.* v. *United States* (D. C. N. D. Ill.), and *Apger* v. *United States* (D. C. N. D. Ohio), respectively.

Administrative Procedure Act, 60 Stat. 237, 5 U. S. C. § 1001 *et seq.;* and the right of the protestants to introduce additional evidence in the district courts. Since there were only minor differences in the content of the two cases appealed, they may be treated together.

I. *Introduction.*—We consider at the outset the existing conditions of the motor truck industry and its regulation as developed during the Commission's hearings because only against such a background are the rules meaningful. Commission authorization in the form of permits or certificates of convenience and necessity is a precondition to interstate service by virtue of the Motor Carrier Act. Such authorization, except under the "grandfather" clause, is granted only after a showing of fitness and ability to perform and a public need for the proffered service. And it specifically limits the scope and business of the permitted operations in the case of a contract carrier, and the routes and termini which may be served by a certificated common carrier.[2]

The Act waives these conditions of agency authorization and service limitations for a sizable portion of the industry, however. Most important of the exempt operations are those involving equipment used in the transportation of agricultural products. By and large, the equipment in this category is owned and operated by the same person. It falls only within the Commission's jurisdiction over drivers' qualifications, hours of service and safety.[3] And so there is no mandate on these exempt owner-operators to provide adequate and nondiscrimina-

---

[2] Interstate Commerce Act, §§ 206–209, 49 Stat. 551–553.

[3] The Commission's safety regulations are published at 49 CFR, Parts 190–196. Section 203 (b) also exempts (1) school transportation, (2) taxicabs, (3) hotel service, (4) national park transportation, (4a) farmers, (5) cooperatives, (7) newspapers, (7a) airlines, (8) local service, and (9) "casual" transportation.

tory service, adhere to published rates, and comply with the strict insurance requirements imposed on carriers authorized for general carriage.[4]

Because of the limiting character of the regulatory system, authorized carriers have developed a wide practice of using nonowned equipment. They have moved in two directions. The first is interchange. This includes those arrangements whereby two or more certificated carriers provide for through travel of a load in order to merge the advantages of certification to serve different areas. In this fashion, a wholly or partially loaded trailer may be exchanged at the established interchange point, or even an entire truck travel the line without interruption, under the guise of a shift in control. The second is leasing. This relates to the use of exempt equipment in authorized operations. Carriers subject to Commission jurisdiction have increasingly turned to owner-operator truckers to satisfy their need for equipment as their service demands. By a variety of arrangements, the authorized carriers hire them to conduct operations under the former's permit or certificate. Such operators thus travel approved routes with nonexempt property, and in the great majority of instances sever connections with their lessee carrier at the end of the trip.[5]

The use of nonowned equipment by authorized carriers is not illegal, either under the Act or the rules under

---

[4] See Interstate Commerce Act, §§ 209 (b), 216 (e), 217 (b), 49 Stat. 553, 558, 561, and 49 CFR, Part 174.

[5] It apparently is difficult to generalize about the economic significance of leasing and interchange. A survey made by the Bureau in 1947 disclosed only that about two-thirds of the carriers did not lease. The desirability to each carrier would be affected by many variables, of course, including the number of trucks he owned, the volume and stability of local demand and the extent of his carrying authority.

consideration.[6]  But evidence is overwhelming that a number of satellite practices directly affect the regulatory scheme of the Act, the public interest in necessary service and the economic stability of the industry, and it is on these that the rules focus.  It appears, for instance, that while many arrangements are reduced to writing, oral leases are common; some were concluded after the trips were made and in several cases exempt operators solicited business themselves with blank authorized carrier forms or other evidence of agency.  It is strongly urged that this very informality of the contractual relationship between carrier and exempt operator creates conditions in the industry inconsistent with those which the Act contemplates.  Proof was proffered during the proceedings that the informal and tenuous relationships in lease and interchange permit evasions of the limitations on certificated or permitted authority.  Since the driver of the exempt equipment is not an employee of the carrier, sanctions for violation of geographical restrictions are clearly difficult to impose, especially in the case of the single-trip lessor.  Interchange may, as well, become a device to circumvent geographical restrictions in the certificate.  The practice of authorized carriers conducting operations beyond the territory they are entitled to serve under cover of a lease from the local carrier was clearly shown in the evidence before the Commission.  It appeared, in fact, that some of these operations are entirely fictional, being created *ad hoc* after the trip is made—and this at times in the wake of a specific denial by the Commission of an application to serve the area.

---

[6] It appears, however, that a number of states control the practice already.  Washington, which has filed an intervenor brief here urging affirmance, is notable in limiting trip leases, and in requiring that the driver be an employee of the carrier and that the latter control the vehicle.  The relevant provision is cited to us as "Leasing Rule 40" by the Brief of the Attorney General of that State.

It was also alleged, and shown by evidence of some incidents, that the Commission's safety requirements were not observed by exempt lessors. Because of the fact that the great bulk of the arrangements cover only one trip, leasing carriers have little opportunity or desire to inspect the equipment used, especially in cases where the agreement is made without the operator's appearance at the carrier's terminal. Enforcement sanctions by the carriers for violations would be clearly as difficult to impose as route standards. Hence, the carrier may not extend the supervision of rest periods, doctors' certificates, brakes, lights, tires, steering equipment and loading, normally accorded his own employees and vehicles, to equipment and drivers secured through lease. And the owner-operator himself is called upon to push himself and his truck because of the economic impact of time spent off the road and investment in repairs on his slim profit margin.[7] Further, the absence of written agreements has made the fixing of the lessee's responsibility for accidents highly difficult.

Consequences on the economic stability of the industry were also noted. The carrier engaged in leasing practice is at the mercy of the cost and supply of exempt equipment available to him. Hence, he may at times find himself unable to undertake shipping obligations because no trucks are available willing to make a relatively unprofitable trip or to assume the burdens of less-than-carload service. Certification is granted on a showing that a concern is fit and willing to provide nondiscriminatory service required by the public convenience. To sustain this obligation, the authorized integrated carrier who finds his

---

[7] The conclusion that highway safety may be impaired rests admittedly on informed speculation rather than statistical certainty. A road check examination conducted by the Bureau did not indicate any significant difference in the number of safety violations between leased and owned vehicles.

leasing competitor only willing to undertake the more profitable ventures may be obliged to rely on miscellaneous freight without compensating economic long carload hauls to sustain estimated profit margins.

Use of exempt equipment by authorized carriers also tends to obstruct normal rate regulation. Schedules are traditionally grounded in costs. But the cost picture of a carrier who depends largely on leased equipment is far different from that of a carrier owning his own trucks. Not only is the former able to undertake operations with relatively slight investment. As well, his current overhead involved in operating leased equipment is solely administrative, the owner of the exempt equipment bearing the expense of gas, oil, tires, wages and depreciation out of his share of the fee. And to refer to the exempt owner's own expenses as determinative of what is a "reasonable" rate would be manifestly impossible as long as the relationships between lessor and lessee are too tenuous, short-termed and informal and the compensation of each based on a division of revenue.

It is claimed that the practice in fact has had a demoralizing effect on the industry. Authorized carriers find it advantageous to expand their operations by leased equipment because of the fact that no investment is required, nor is the risk of empty return trips and other overhead incurred. Hence, carriers owning their own trucks face a fluid rate structure in competition with those specializing in use of exempt equipment, especially where such equipment is offered for a trip, as it often is, for expenses. There is thus a pressure on the certificated operator to enter the leasing field and hence expand the effect of these conditions and practices on efficient, safe and nondiscriminatory truck service which the Act is designed to promote.

II. *Commission Proceedings.*—All before us admit the difficulties which have developed. In fact, the Commission has considered them for some years. As early as

1940, following complaints, the Bureau of Motor Carriers held hearings on the subject which culminated in a statistical report in 1943. The necessity of maximum use of transportation resources during the war postponed any action thereafter until 1947.[8] In that year, however, the Director of the Bureau reinstituted discussion, had suggested regulations drafted, and drew on his field staff for reports of the use of the exempt vehicles by authorized carriers. The present proceedings were instituted by the Commission on January 9, 1948, when it became apparent that carrier agreement regarding a proper solution was unlikely. Its order, published at 13 Fed. Reg. 369, declared all authorized carriers respondents and set forth the practices to be investigated, four possible schemes of regulation, and suggested rules. A qualified examiner thereafter heard some 80 witnesses in Washington and St. Louis, and issued a report and proposed rules. A full report by the Commission's Division 5 followed on June 26, 1950, confirming the examiner's findings and amending his proposals,[9] and, following petitions for reconsideration, the entire Commission reopened proceedings for oral argument. The Commission's report, dated May 8, 1951, in effect adopted the examiner's proposed rules, after affirming and reiterating the nature and effect of

---

[8] See General Order O. D. T. 3, Revised, §§ 501.5 (d), 501.9, 501.10, 501.13, July 14, 1942, 7 Fed. Reg. 5445 *et seq.*, requiring full leasing, interchange and division of revenues; I. C. C. Emergency Order No. M-1, June 11, 1942, §§ 215.101, 215.105, 7 Fed. Reg. 4429; and I. C. C. Emergency Order M-6, November 1, 1945, § 176.10 (a), 10 Fed. Reg. 13595.

[9] *Ex Parte No. MC-43, Lease and Interchange of Vehicles by Motor Carriers,* 51 M. C. C. 461.

The change went to the heart of the problem. The examiner had suggested a requirement that the rental be of at least 30 days' duration and that compensation be on a basis other than a division of revenues. Division 5 rejected both provisions, recognizing that they would in effect abolish trip-leasing.

leasing and interchange practices on the industry and regulation under the Act.

III. *The Rules.*—In this final form, the rules establish as conditions to the use of nonowned equipment by authorized carriers the reduction of the contracts to writing. Rule § 207.4 (a)(2), 52 M. C. C. 744. It is required that such contracts vest exclusive possession of, and responsibility for, the equipment in the authorized carrier during the rental, Rule § 207.4 (a)(4), the life of which must exceed thirty days when the driver is the owner or his employee. Rule § 207.4 (a)(3). Finally, the contract must fix the compensation of the lessor, which may not be measured by a percentage of the gross revenue. Rule § 207.4 (a)(5). Interchange agreements between two authorized carriers must also be in writing and the equipment must be driven by an employee of the certificated carrier over whose authorized route it travels. Rule § 207.5 (a), (c).

The rules also require inspection of nonowned equipment when the lessee carrier takes possession, Rule § 207.4 (c), as well as the identification of the trucks as within its responsibility, Rule § 207.4 (d), and the testing of the driver's familiarity with Motor Carrier Safety Regulations. Rule § 207.4 (e). Records of the use of rented and interchanged equipment are mandatory. Rule § 207.4 (f).

IV. *Commission Authority.*—Appellants focus their principal attack on the lease provisions requiring a thirty-day period of carrier control and a measure of compensation other than revenue splitting. All agree that the rules thus abolish trip-leasing. Unfortunate consequences are predicted for the public interest because the exempt owner-operator will no longer be able to hire himself out at will—in sum, that the industry's ability to serve a fluctuating demand will suffer and transportation costs accordingly go up. It is the Commission's position that

the industry and the public will benefit directly because of the stabilization of conditions of competition and rate schedules, and that in fact the continued effectiveness of the Commission's functions under the Motor Carrier Act is dependent on regulation of leasing and interchange. Needless to say, we are ill equipped to weigh such predictions of the economic future. Nor is it our function to act as a super-commission. So we turn to the legal considerations so strongly urged on us.

Here, appellants have framed their position as a broadside attack on the Commission's asserted power. All urge upon us the fact that nowhere in the Act is there an express delegation of power to control, regulate or affect leasing practices,[10] and it is further insisted that in each separate provision of the Act granting regulatory authority there is no direct implication of such power. Our function, however, does not stop with a section-by-section search for the phrase "regulation of leasing practices" among the literal words of the statutory provisions. As a matter of principle, we might agree with appellants' contentions if we thought it a reasonable canon of interpretation that the draftsmen of acts delegating agency powers, as a practical and realistic matter, can or do include spe-

---

[10] The Act as originally drafted included, as a definition of carriers, all engaged in transportation "whether directly or by a lease." § 203 (a)(14), (15), 49 Stat. 544, 545. The "added language [was] intended to check evasion of the act by bringing within its terms such transportation operations as are performed through the leasing of motor vehicles or other similar arrangements which may constitute either common or contract carriage, according to the particular nature of the arrangements. The language inserted will enable the Commission to strike through such evasions where the facts warrant it." 79 Cong. Rec. 5651. The terminology was stricken by the Transportation Act of 1940, 54 Stat. 898, 920, which, however, introduced no qualification and which, as we have indicated, was merely "[f]or purposes of clarity." *Thomson* v. *United States*, 321 U. S. 19, 23. See 86 Cong. Rec. 11546.

cific consideration of every evil sought to be corrected. But no great acquaintance with practical affairs is required to know that such prescience, either in fact or in the minds of Congress, does not exist. *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 219–220; *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 193–194. Its very absence, moreover, is precisely one of the reasons why regulatory agencies such as the Commission are created, for it is the fond hope of their authors that they bring to their work the expert's familiarity with industry conditions which members of the delegating legislatures cannot be expected to possess. *United States* v. *Pennsylvania R. Co.,* 323 U. S. 612.

Moreover, we must reject at the outset any conclusion that the rules as a whole represent an attempt by the Commission to expand its power arbitrarily; there is clear and adequate evidence of evils attendant on trip-leasing. The purpose of the rules is to protect the industry from practices detrimental to the maintenance of sound transportation services consistent with the regulatory system. Sections 216 (b) and 218 (a) of the Act, for instance, require the filing of a just and reasonable rate schedule by each common carrier, and the violation of these rates and the demoralization of rate structures generally are a probable concomitant of current leasing practices. Section 204 (a)(2) requires the Commission to impose rules relating to safety of operation for vehicles and drivers. These are likewise threatened by the unrestricted use of nonowned equipment by the common carriers. And the requirements of continuous service in § 204 (a)(1), of observance of authorized routes and termini under §§ 208 (a) and 209 (b), and the prohibitions of rebates, §§ 216 (d), 217 (b), 218 (a) and 222 (c), also may be ignored through the very practices here proscribed.

So the rules in question are aimed at conditions which may directly frustrate the success of the regulation undertaken by Congress. Included in the Act as a duty of the Commission is that "[t]o administer, execute, and enforce all provisions of this part, to make all necessary orders in connection therewith, and to prescribe rules, regulations, and procedure for such administration." § 204 (a)(6). And this necessary rule-making power, coterminous with the scope of agency regulation itself, must extend to the "transportation of passengers or property by motor carriers engaged in interstate or foreign commerce and to the procurement of and the provision of facilities for such transportation," regulation of which is vested in the Commission by § 202 (a). See also § 203 (a)(19).

We cannot agree with appellants' contention that the rule-making authority of § 204 (a)(6) merely concerns agency procedures and is solely administrative. It ignores the distinct reference in the section to enforcement. Furthermore, the power of the Commission to make rules applicable to transfers of certificates or permits is recognized by § 212 (b). That section permits transfers "pursuant to such rules and regulations as the Commission may prescribe." It does not strain logic or experience to look upon leasing of exempt equipment and interchange as a transfer, temporary in nature, of the carrier's authorized right to serve his specified area; in fact we think this interpretation is dramatically supported here by the evidence that owner-operators themselves take the initiative in securing cargoes, while the carriers accept only the administrative function of approving the use of the nonowned equipment over their authorized routes and under their names. It is an unnatural construction of the Act which would require the Commission to sit idly by and wink at practices that lead to violations of its provisions.

We hold then that the promulgation of these rules for authorized carriers falls within the Commission's power, despite the absence of specific reference to leasing practices in the Act. See *General Tank Car Corp.* v. *Terminal Co.*, 308 U. S. 422, 432. The grant of general rule-making power necessary for enforcement compels this result. It is foreshadowed, of course, by *United States* v. *Pennsylvania R. Co.*, 323 U. S. 612. That case validated an order requiring railroads to lease cars to a competing carrier by sea, in spite of the inability of the Commission to ground its action on some specific provision of the Act. 323 U. S., at 616. This Court pointed to the fact that the "unquestioned power of the Commission to require establishment of [through] routes would be wholly fruitless, without the correlative power to abrogate the Association's rule which prohibits the interchange." 323 U. S., at 619. There is evidence here that convinces us that that regulation of leasing practices is likewise a necessary power; in fact, we think its exercise more crucial than in *United States* v. *Pennsylvania R. Co.* The enforcement of only one phase of the Act was there endangered; here, practically the entire regulatory scheme is affected by trip-leasing.

A fair analogy appears between the conditions which brought about the Motor Carrier Act and those sought to be corrected by the present rules, confirming our view of the Commission's jurisdiction. Then the industry was unstable economically, dominated by ease of competitive entry and a fluid rate picture. And as a result, it became overcrowded with small economic units which proved unable to satisfy even the most minimal standards of safety or financial responsibility.[11] So Congress felt

---

[11] Regulation of Transportation Agencies, S. Doc. No. 152, 73d Cong., 2d Sess. 14–15, 22–35, 226; 79 Cong. Rec. 12196, 12209; Hearings, Senate Committee on Interstate Commerce, on S. 1629, S. 1632, and S. 1635, 74th Cong., 1st Sess., Part I, 78–80, 404–405, 410–411.

compelled to require authorization for all interstate operations to preserve the motor transportation system from over-competition, while at the same time protecting existing routes through the "grandfather" clause.[12] The Commission's rule-making here considered is based on conditions that similarly threaten, though perhaps to a lesser degree, the efficient operation of the industry today.

And as exercised, the power under § 204 (a)(6) is geared to and bounded by the limits of the regulatory system of the Act which it supplements. It is thus as clearly defined for constitutional purposes as the specified functions of the Commission, and so reliance on *Schechter Poultry Corp.* v. *United States,* 295 U. S. 495, 529, and *Panama Refining Co.* v. *Ryan,* 293 U. S. 388, 421, is misplaced. We reject for similar reasons the contention that *Federal Power Commission* v. *Panhandle Eastern Pipe Line Co.,* 337 U. S. 498, is controlling here. Our holding that the Federal Power Commission's authority did not extend to production and gathering of natural gas was specifically grounded in a provision of the Natural Gas Act to that effect. 337 U. S., at 504–505.

V. *The National Transportation Policy.*—What we have said above answers appellants' companion contention that the rules are invalid because they violate the National Transportation Policy as set out in 49 U. S. C., preceding § 1. Regulation under the Act is there declared to be in the interests of the preservation of the inherent advantages of all modes of transportation, and of an economically sound, safe, and efficient industry. See *United States* v. *Rock Island Motor Transit Co.,* 340 U. S. 419, and *United States* v. *Texas & Pacific Motor Transport Co.,* 340 U. S. 450. But no overly-nice distinction between law and policy is needed to support

---

[12] 79 Cong. Rec. 12207–12211; 12222–12225.

the view that the question is hardly one for the courts; it is clear that the rules represent, at best, a compromise between stability and flexibility of industry conditions, each alleged to be in the national interest, and we can only look to see if the Commission has applied its familiarity with transportation problems to these conflicting considerations. The mere fact that a contrary position was taken during the war years when active interchange and leasing were required,[13] that the Commission has never before restricted trip-leasing and has in fact approved it from time to time,[14] does not change our function.

VI. *Reasonableness of Rules and Exemptions Therefrom.*—The relationship of these rules to the regulatory scheme they are designed to protect forms a basis for the answer to the various allegations that certain rules are arbitrary. For our purposes, such an argument must mean that the Commission had no reasonable ground for the exercise of judgment. In the instant case, such is not the situation; the evidence marshalled before the Commission plainly supports the conclusion that the continued effectiveness of its regulation requires the rules prescribed.

We also affirm a reasonable relationship between the aims of the federal regulatory scheme and the exemptions in the rules. That as to interchange between carriers over routes which both are authorized to serve, Rule § 207.3

---

[13] See footnote 8, *supra.*

[14] *Dixie Ohio Express Co. Common Carrier Application,* 17 M. C. C. 735; *Greyvan Lines, Inc., Common Carrier Application,* 32 M. C. C. 719. See, however, I. C. C. Administrative Ruling No. 4, August 19, 1936, which represents an early effort on the part of the Commission to bring leased equipment under the control of the carriers for purposes of the Act. This was apparently abandoned after this Court's decisions in *United States* v. *Rosenblum Truck Lines, Inc.,* 315 U. S. 50, and *Thomson* v. *United States,* 321 U. S. 19.

(a), is founded on the proposition that unauthorized certificate extensions are here impossible. The exemption extended to trucking equipment used in railway express operations, Rule § 207.3 (b), which are largely confined to municipalities and contiguous areas, and short trips, duplicates the similar exemption applicable to contract and common carriers in Rule § 207.3 (c). It is alleged that the exclusion of the substituted motor-for-rail transport equipment from the rules' coverage by Rule § 207.3 (b) also is based on the fact that the evils of unauthorized service, lax observation of safety regulations, and demoralized competitive conditions are not present in such operations. As the Commission found, the leasing practices in the field are undertaken through long-term contracts with certain established lessors, and the equipment inspected and controlled by the railroads, and identified with its name. In such a context, the exemption is not unreasonable; certainly it is not required that the Commission extend its supervisory activities under the rules into fields where the evidence before it indicates no need, merely to satisfy some standard of paper equality. And this is especially so in the field of substituted motor-for-rail carriage which falls within the Commission's strict regulation by virtue of the restrictions which we approved in *United States* v. *Rock Island Motor Transit Co.,* 340 U. S. 419, and *United States* v. *Texas & Pacific Motor Transport Co.,* 340 U. S. 450. The exemption for plans of operations merged under § 5 of the Act, Rule § 207.3 (d), is said to have been directed solely toward Allied Van Lines, whose § 5 proceeding, reported *Evanston Fireproof Warehouse—Control—Allied Van Lines,* 40 M. C. C. 557, involving a unique leasing arrangement by stockholding hauling agents under the company's name, has already been scrutinized by the Commission. Since Allied operates entirely with equipment supplied under this ar-

rangement, and since the Commission has specifically approved it, it seems to us that the exemption has a reasonable basis; the guarantees of insurance coverage, financial responsibility, lessee route control and equipment identification in Allied's operations, 40 M. C. C. 551, 563–566, promise protection against the evils the rules seek to correct.

VII. *Preservation of the Right to Augment Equipment.*—Appellants further contend, however, that the rules in effect will violate the protections in §§ 208 (a) and 209 (b) of the Act of the carriers' right to augment their equipment.[15]   We do not agree.   The provisos in question are not to be read as blanket restrictions on the Commission's regulatory powers; they are aimed at the restrictions on the increase in volume of traffic through acquisition of additional vehicles.   Clearly, a numerical limitation would be invalid, but the Commission's refusal to permit carriers to secure and use equipment which does not satisfy its safety, loading, and licensing rules would not.   As we pointed out in *Crescent Express Lines, Inc.* v. *United States,* 320 U. S. 401, 408, in sustaining a certifi-

---

[15] "SEC. 208. (a) Any certificate issued under section 206 or 207 shall specify the service to be rendered . . . : *Provided, however,* That no terms, conditions, or limitations shall restrict the right of the carrier to add to his or its equipment and facilities over the routes, between the termini, or within the territory specified in the certificate, as the development of the business and the demands of the public shall require."

SEC. 209. "(b) . . . The Commission shall specify in the permit the business of the contract carrier covered thereby and the scope thereof . . . *Provided, however,* That no terms, conditions, or limitations shall restrict the right of the carrier to substitute or add contracts within the scope of the permit, or to add to his or its equipment and facilities, within the scope of the permit, as the development of the business and the demands of the public may require."

cate limited to seven-passenger vehicles, since § 208 "requires the Commission to specify the service to be rendered, this could not be done without power also to specify the general type of vehicle to be used." We think it equally apparent that regulation of the conditions and circumstances of the use of nonowned vehicles is not a "limitation on the addition of more vehicles of the authorized type." 320 U. S., at 409.

VIII. *Preservation of Agricultural Exemption.*—As indicated above, the Act also exempts from Commission jurisdiction "motor vehicles used in carrying property consisting of ordinary livestock, fish (including shell fish), or agricultural commodities (not including manufactured products thereof), if such motor vehicles are not used in carrying any other property, or passengers, for compensation," § 203 (b)(6),[16] and appellants, and particularly the intervening Secretary of Agriculture, urge that the rules will drastically reduce the significance of this section in violation of Congress' intent. All admit, of course, that the rules do not directly apply to agricultural equipment; it is merely required that authorized carriers using such trucks comply with certain provisions. But it is contended that the preconditions to such use imposed on those within Commission jurisdiction will wipe out much of the traffic which the agricultural carriers have heretofore engaged in. It appears, for instance, that a substantial leasing is built on agricultural haulers who would otherwise return empty to their place of departure, having unloaded the farm produce carried; the authorized carriers have found them prepared to accept a one-trip engagement for the return route. The thirty-

---

[16] Likewise exempted are "motor vehicles controlled and operated by any farmer when used in the transportation of his agricultural commodities and products thereof, or in the transportation of supplies to his farm." § 203 (b)(4a).

day lease provision will make such arrangements impossible.

We are unable, however, to conclude that the economic danger to the agricultural truckers from these rules constitutes a violation of § 203 (b)(6). The mere fact that commercial carriers of agricultural products will hereafter be required to establish their charges on the basis of an empty return trip is not the same as bringing them within. Commission jurisdiction generally. The exemption extends, by its own words, to carriage of agricultural products, and not to operations where the equipment is used to carry other property. Needless to say, the statute is not designed to allow farm truckers to compete with authorized and certificated motor carriers in the carriage of non-agricultural products or manufactured products for off-the-farm use, merely because they have exemption when carrying only agricultural products. We can therefore find nothing in it which implies protection of agricultural truckers' right to haul other property, even though from an economic standpoint that right is important to protect profit margins. Regulated truckers must also receive protection upon their restricted routes and limited carriage. A balance between these competing factors, carried out in accordance with congressional purpose,[17] does not seem to us unreasonable or invalid.

IX. *Agency Procedure.*—We need not pause long over certain procedural objections which appellants have interposed. They object that the rules were the product of proceedings fatally at variance with certain requirements of the Administrative Procedure Act. Appellants in No. 35 point to the requirement of § 7 (c), that "the

---

[17] The National Transportation Policy, 49 U. S. C., preceding § 1, specifically refers to "fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each."

proponent of a rule or order shall have the burden of proof," and insist that the Commission, or its Motor Carriers Bureau which drew up suggested rules published as a supplement to the hearing order, 13 Fed. Reg. 369, did not satisfy this burden by preponderating evidence. But even assuming that the Commission was a statutory "proponent" of the regulation and that it did not actively introduce the requisite degree of proof in support of its position, we think it plain that the requirement is inapplicable to the instant proceedings. For § 7 of the Administrative Procedure Act is limited by its own terms to "hearings which section 4 or 5 requires to be conducted pursuant to this section." Turning to those sections, it is found that they invoke § 7 only when specified by statute: "Where rules are required by statute to be made on the record after opportunity for an agency hearing, the requirements of sections 7 and 8 shall apply in place of the provisions of this subsection." [18] In short,

---

[18] Section 4 of the Administrative Procedure Act sets out only the following applicable requirements:

"(a) NOTICE.—General notice of proposed rule making shall be published in the Federal Register (unless all persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law) and shall include (1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved. . . .

"(b) PROCEDURES.—After notice required by this section, the agency shall afford interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity to present the same orally in any manner; and, after consideration of all relevant matter presented, the agency shall incorporate in any rules adopted a concise general statement of their basis and purpose." 60 Stat. 237, 239, 5 U. S. C. § 1003.

There is no question but that the Federal Register notice and participation requirements were satisfied. See p. 307, *supra.*

§ 7 applies only when hearings were required by the statute under which they were conducted to be made on the record and with opportunity for oral hearing. As we have pointed out, the rule-making authority in the instant case stems from § 204 (a)(6) of the Motor Carrier Act; nothing there requires record or hearing, in direct contrast with the rate-making procedure provisions of §§ 216 (e) and 218 (b). Hence, whatever our view of the substantiality of the evidence, we do not think that the rules must fall because the Commission failed to assume and satisfy a "burden of proof."

Similar reasoning supports our conclusion that § 8 (b) of the Administrative Procedure Act, which requires that decisions shall "include a statement of (1) findings and conclusions," invoked by appellants in No. 26, is likewise inapplicable. For it, in turn, is limited to a "hearing . . . required to be conducted in conformity with section 7."

X. *Right to Introduce Evidence of Confiscation.*— Finally, appellants assign as error the refusal of the District Court in No. 35 to permit introduction of additional oral evidence there. Their offer of proof indicated that it would concern the "value of Plaintiffs' property and rights" and "the effect of the order on said property and rights." This Court has indicated many times, it is true, that those concerned with an order affecting their just compensation for transportation services must be heard; indeed, their right to introduce evidence to support the claim that the order in question will unconstitutionally confiscate their property may be enforced even in the District Court, if the Commission bars an opportunity to do so. *Manufacturers R. Co.* v. *United States,* 246 U. S. 457, 488–490; *St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38, 53–54; *Baltimore & Ohio R. Co.* v. *United States,* 298 U. S. 349, 362–369; *New York* v. *United States,* 331 U. S. 284, 334–335.

But the right is not to be construed as an avenue toward delay. The claim of confiscation must be substantial, the import of the proffered evidence clear, and the inability to test the question before the Commission patent, in order to justify an oral hearing on the question in the courts. In the case at bar, appellants seek in substance to show that the outlawing of trip-leasing will affect their business; perhaps they might even be able to prove that some concerns would fail if they were unable in the future to resort to nonowned equipment for short periods. In this context, however, we do not think that a right to trial *de novo* is automatically established merely because the Commission denied a petition for rehearing which invoked constitutional principles. In the first place, there was in truth a multitude of evidence before the Commission on the importance of trip-leasing to some concerns. Moreover, we are clear that appellants had an opportunity to introduce this very evidence in the agency proceedings, for it required no great prescience, in view of the notice of the hearings published by the Commission, to know that they would concern the importance and desirability of the very practices appellants seek to protect.

"Confiscatory" is not a magic word. Whether it should open the door to further proceedings depends on the nature of the order attacked. We think a claim of rate confiscation, which was the concern of the cases just cited, stands on a fundamentally different footing from that made in the instant case.[19] Rate-making represents an order affecting the volume of income; it is said to confiscate property when it prohibits a reasonable return on

---

[19] We have already noted the Motor Carrier Act itself distinguishes between the scope of a hearing required in rate proceedings and those held in relation to general rule-making under § 204 (a) (6).

investment beyond operating and initial costs. But the economic significance of the abolishment of trip-leasing is not nearly so direct. The Commission has merely determined by what method the carrier's income is to be produced, and not how much it may charge.

It is true that we have admonished the Commission and the courts to permit introduction of evidence on the economic impact of a rate order where the claim that it could not have been proffered during the original proceedings was genuine. But that was because the "constitutional right of compensation," *St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38, 54, was drawn in question. Here, appellants can make no comparable claim. They attack an order which is valid even if its effect is to drive some operators out of business. As we have indicated, the rule-making power is rooted in and supplements Congress' regulatory scheme, which in turn derives from the commerce power. The fact that the value of some going concerns may be affected, therefore, does not support a claim under the Fifth Amendment, if the rules and the Act be related, as we have said they are, to evils in commerce which the federal power may reach.[20] This being the case, appellants had no constitutional

---

[20] Compare the principles applicable to rate-making with what we have said about the Fifth Amendment in the related field of wage and hour laws under the commerce power, *United States* v. *Darby,* 312 U. S. 100, 125. This Court has pointed out many times that the exercise of the federal commerce power is not dependent on its maintenance of the economic *status quo;* the Fifth Amendment is no protection against a congressional scheme of business regulation otherwise valid, merely because it disturbs the profitability or methods of the interstate concerns affected. *Labor Board* v. *Jones & Laughlin S. Corp.,* 301 U. S. 1, 43–45; *Currin* v. *Wallace,* 306 U. S. 1, 13–15; *United States* v. *Rock Royal Co-operative, Inc.,* 307 U. S. 533, 572–573; *North American Co.* v. *Securities & Exchange Comm'n,* 327 U. S. 686, 707–710; *American Power & Light Co.* v. *Securities & Exchange Comm'n,* 329 U. S. 90, 106–108.

claim in support of which they are entitled to introduce evidence *de novo,* and the court did not err in sustaining the objection thereto.

*Affirmed.*

## APPENDIX TO OPINION OF THE COURT.

*Rules prescribed governing the practices of authorized carriers of property by motor vehicle in Interstate or Foreign Commerce in (1) augmenting equipment, (2) interchanging of equipment, and (3) renting vehicles or equipment to private carriers or shippers*

.        .        .        .        .

§ 207.3 *Exemptions.*—Other than § 207.4 (c) and (d), relative to inspection and identification of equipment, these rules shall not apply—

(a) To equipment leased by one authorized carrier operating over regular routes to another authorized carrier operating over regular routes and operated between points and over routes which both lessor and lessee are authorized to serve, and to equipment leased by one authorized carrier operating over irregular routes to another such carrier and operated between points and within territory which both the lessor and lessee are authorized to serve;

(b) To equipment utilized wholly or in part in the transportation of railway express traffic, or in substituted motor-for-rail transportation of railroad freight moving between points that are railroad stations on railroad billing;

(c) To equipment utilized in transportation performed solely and exclusively within any municipality, contiguous municipalities, or commercial zone, as defined by the Commission;

(d) To equipment utilized by an authorized carrier in transportation performed pursuant to any plan of opera-

tion approved by the Commission in a proceeding arising under section 5 of the Interstate Commerce Act . . . .

. . . . .

§ 207.4 *Augmenting equipment.*—Other than equipment exchanged between motor common carriers in interchange service as defined in § 207.5 of these rules, authorized carriers may perform authorized transportation in or with equipment which they do not own only under the following conditions:

(a) The contract, lease, or other arrangement for the use of such equipment—

(1) Shall be made between the authorized carrier and the owner of the equipment;

(2) Shall be in writing and signed by the parties thereto, or their regular employees or agents duly authorized to act for them in the execution of contracts, leases, or other arrangements;

(3) Shall specify the period for which it applies, which shall be not less than 30 days when the equipment is to be operated for the authorized carrier by the owner or employees of the owner; . . . .

. . . . .

(4) Shall provide for the exclusive possession, control and use of the equipment, and for the complete assumption of responsibility in respect thereto, by the authorized carrier, . . . .

. . . . .

(5) Shall specify the compensation to be paid by the lessee for the rental of the leased equipment; provided, however, that such compensation shall not be computed on the basis of any division or percentage of any applicable rate or rates on any commodity or commodities transported in said vehicle or on a division or percentage of any revenue earned by said vehicle during the period for which the lease is effective;

(6) Shall specify the time and date or the circumstance on which the contract, lease, or other arrangement begins, and the time or the circumstance on which it ends. The duration of the contract, lease, or other arrangement shall coincide with the time for the giving of receipts for the equipment, as required by paragraph (b) of this section . . . .

.     .     .     .     .

(c) *Inspection of equipment.*—It shall be the duty of the authorized carrier, before taking possession of equipment, to inspect the same or to have the same inspected . . . .

.     .     .     .     .

(d) *Identification of equipment.*—The authorized carrier acquiring the use of equipment under this rule shall properly and correctly identify such equipment as operated by it . . . .

.     .     .     .     .

(e) *Driver of equipment.*—Before any person other than a regular employee of the authorized carrier is assigned to drive equipment operated under these rules, it shall be the duty of the authorized carrier to make certain that such driver is familiar with, and that his employment as a driver will not result in, violation of any provision of parts 192, 193, 195, and 196 of the Motor Carrier Safety Regulations (Rev.) pertaining to "Driving of Motor Vehicles," "Parts and Accessories Necessary for Safe Operation," "Hours of Service of Drivers," and "Inspection and Maintenance," and to require such driver to furnish a certificate of physical examination in accordance with part 191 of the Motor Carrier Safety Regulations (Rev.) pertaining to "Qualifications of Drivers," or, in lieu thereof, a photostatic copy of the original certificate of physical examination, which shall be retained in the authorized carrier's file.

(f) *Record of use of equipment.*—The authorized carrier utilizing equipment operated under these rules shall prepare and keep a manifest covering each trip for which the equipment is used in its service, containing the name and address of the owner of such equipment, the make, model, year, serial number, and the State registration number of the equipment, and the name and address of the driver operating the equipment, point of origin, the time and date of departure, the point of final destination, and the authorized carrier's serial number of any identification device affixed to the equipment. . . .

§ 207.5 *Interchange of equipment.*—Common carriers of property may by contract, lease, or other arrangement, interchange any equipment defined in § 207.2 of these rules with one or more other common carriers of property, or one of such carriers may receive from another such carrier, any of such equipment, in connection with any through movement of traffic, under the following conditions:

(a) *Agreement providing for interchange.*—The contract, lease, or other arrangement providing for interchange shall specifically describe the equipment to be interchanged; the specific points of interchange; the use to be made of the equipment and the consideration for such use; and shall be signed by the parties to the contract, lease, or other arrangement, or their regular employees or agents duly authorized to act for them, in the execution of such contracts, leases, or other arrangements.

(b) *Authority of carriers participating in interchange.*—The certificates of public convenience and necessity held by the carriers participating in the interchange arrangement must authorize the transportation of the commodities proposed to be transported in the through movement, and service from and to the point where the physical interchange occurs.

(c) *Driver of interchanged equipment.*—Each carrier must assign its own driver to operate the equipment that is proposed to be operated from and to the point or points of interchange and over the route or routes or within the territory authorized in the participating carriers' respective certificates of public convenience and necessity.

(d) *Through bills of lading.*—The traffic transported in interchange service must move on through bills of lading issued by the originating carrier, and the rates charged and revenues collected must be accounted for in the same manner as if there had been no interchange of equipment. Charges for the use of the equipment shall be kept separate and distinct from divisions of the joint rates or the proportions thereof accruing to the carriers by the application of local or proportional rates.

(e) *Inspection of equipment.*—It shall be the duty of the carrier acquiring the use of equipment in interchange to inspect such equipment, or to have it inspected in the manner provided in § 207.4 (c) of these rules; and equipment which does not meet the requirements of the safety regulations shall not be operated in the respective services of the interchange carriers until the defects have been corrected.

(f) *Identification of equipment.*—The authorized carriers operating equipment in interchange service under this section shall carry with each vehicle so operated a copy of the contract, lease, or other arrangement while the equipment is being operated in the interchange service.

.        .        .        .        .

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS concurs, dissenting.

I agree with the Court that the Interstate Commerce Act grants the Commission broad implied powers to carry out the general purposes outlined in the law. See *United*

*States* v. *Pennsylvania R. Co.,* 323 U. S. 612, 616. But the Commission is without power to invoke vague implications to defeat the Act's purpose or to override its clearly expressed provisions. This, I think, is what the Commission has done in most of the Commission rules which the Court upholds. In my view the rules run counter to the Act in three important respects:

A. The congressionally granted right of motor carriers to choose for themselves whether they would use leased or purchased equipment is practically destroyed by the imposition of burdensome restrictions.

B. The exemption from regulation granted carriers of agricultural products by § 203 (b) of Part II´ of the Act is burdened by restrictive rules that substantially take away the advantages Congress intended to confer by the exemption.

C. Railroads that operate motor vehicles as a part of the business of common carriage are granted special advantages in violation of the express policy of the Act which requires each method of transportation to be left with its inherent advantages.

A. Motor vehicle common carriage had reached an advanced stage when Congress passed the Motor Carrier Act in 1935.[1] Early development of the business was along lines that the carriers found to be advantageous. Some carriers owned their vehicles, while others leased them. The Act did not try to disrupt this system, but left motor carriers free to continue to own or lease equipment in accordance with their best financial judgment. And Congress was content to regulate the common or contract carriers themselves; it made no effort whatever to regulate those who owned the vehicles that were leased to the regulated carriers. Congress was thus talking

---

[1] 49 Stat. 543, as amended, 54 Stat. 919, 49 U. S. C. § 301.

about the acquisition of equipment by lease as well as by purchase when it provided that the Commission should be without power to restrict the right of carriers to add to their equipment or facilities as the development of their business and the demands of the public required.[2] While this provision is patently not designed to forbid the Commission from limiting the type of vehicles in the interest of safety,[3] the provision just as patently does deprive the Commission of power to forbid the lease and purchase of vehicles which meet the test of safety.

The new rules adopted by the full Commission put burdensome restrictions on the power to lease appropriate vehicles, restrictions which, in my view, go beyond the power of the Commission. These burdensome restrictions had been previously rejected by the Commission's Division V, composed of Commissioners particularly responsible for supervision of motor vehicle affairs as distinguished from supervision of railroad affairs. This record makes plain that enforcement of these burdensome rules will produce violent repercussions in the motor carrier industry; many motor carriers will suffer ruinous losses. The business of leasing vehicles for use by common carriers will be curtailed or perhaps even destroyed. The tendency of the rules is thus to eliminate many small business ventures. It may be, as the Commission seems to think, that the Nation's motor carrier business can be more efficiently accomplished by a few big companies that own all their equipment, than by a large number of small companies that obtain all or part of their equipment by lease. But if that governmental alteration in our business structure is to be ordained, Congress, not the Commission, should do the ordaining.

---

[2] This denial of power to the Commission appears in §§ 208 (a) and 209 (b) of Part II of the Act. 49 U. S. C. §§ 308 (a) and 309 (b).

[3] *Crescent Express Lines* v. *United States,* 320 U. S. 401, 408–409.

B. The farmers of the Nation have for a long time been largely dependent upon reasonably priced motor transportation to get their produce to market.[4]  When the Motor Carrier Act was under consideration, there was much apprehension expressed lest regulation deprive farmers of this advantage.[5]  To meet this feeling, the bill was amended several times and finally was passed with the agricultural exemption set forth in § 203 (b).  Except as to certain safety requirements § 203 (b) exempts from regulation motor vehicles of farmers and farm coopera-

---

[4] For example, in 1950:

PERCENTAGES OF SELECTED FARM PRODUCTS TRANSPORTED
TO PRINCIPAL MARKETS IN TRUCKS.

| | Percent | | Percent |
|---|---|---|---|
| Hogs | 79 | Grapefruit | 43 |
| Cattle | 76 | Oranges | 33 |
| Calves | 78 | Apples | 64 |
| Sheep and Lambs | 44 | Tomatoes | 60 |
| Shell Eggs | 93 | Potatoes | 37 |
| Dressed Poultry | 76 | Lettuce | 41 |
| Live Poultry | 99 | Milk | 79 |

*Transportation of Selected Agricultural Commodities to Leading Markets by Rail and Motortruck, 1939–50,* United States Department of Agriculture, Bureau of Agricultural Economics (June 1951), Table 1, p. 10.

[5] For illustration, Congressman Walter Pierce of Oregon said, "Mr. Chairman, I have watched the debate very closely.  I wonder why this bill?  I am a farmer, living 300 miles from tidewater.  I raise wheat and stock.  The only relief I have ever seen in my 40 years on that farm from the terrific confiscatory railroad freight rates was when the trucks came.

.            .            .            .            .

"The camel is certainly getting his nose into the tent, and this means the death of the motor transportation which the farmer has had and which has been the only relief that has come to him from the previous excessive railroad rates."  79 Cong. Rec. 12216, 12217; see also 12197–12198.

tives used for farm purposes; the same exemption is also granted to all motor vehicles while being used to carry agricultural commodities. There can be no doubt that the Commission's new rules will drive many of these carriers of farm products out of business and that many others will be compelled to increase their rates. Section 207.4 of the new rules is rather obviously designed to make this exemption much less valuable. It forbids authorized carriers to lease motor trucks except for terms of at least 30 days, if the trucks are to be operated by owners or employees of owners. The Commission reported that this rule would completely prohibit trip-leasing.[6] A very large part of all trip-leasing takes place between regulated carriers and truckers who are exempt because they carry farm products. An illustration can be found in the carriage of Florida citrus fruits. On delivering fruit in northern states the practice of these exempt truckers has been to lease their motor vehicles to regulated carriers for the transportation of goods to Florida. Unless vehicles that bring citrus fruits north can make such arrangements they must go back to Florida empty. "Empty or partially loaded trucks on return trips may well drive the enterprise to the wall." *United States* v. *Carolina Carriers Corp.*, 315 U. S. 475, 488. The Commission's rules make it impossible for these exempt carriers of agricultural products to get the advantage of a lease for a return haul. The result is destruction for a large part of that business.

The reason the Commission has adopted a rule so destructive of the agricultural exemption Congress granted is apparent from a colloquy which took place in the District Court. The attorney for the Commission was asked

---

[6] Trip leases can be made by motor carriers specifically exempted from the rules by the Commission—railroad motor carriers, express company motor carriers, and the Allied Van Lines.

if it was wasteful for a truck to go back to Florida empty. With commendable candor he said: "It does seem uneconomical in requiring it to go back empty, but they can—The difficulty comes, I think, in letting it come up in the first place." In other words the "difficulty comes" because Congress agreed to exempt these farm products. This congressionally created "difficulty" is being cleared up by the Commission. Its new rules against trip-leasing will force these agricultural carriers to raise their rates high enough to frustrate purposes underlying the agricultural exemption.[7]

C. The Commission has exempted railroads and express companies that carry goods for hire in motor vehicles from all of the regulations except the provisions of § 207.4 (c) and (d), which latter two provisions relate to inspection and identification of equipment. It is rather interesting that while the full Commission granted the railroads this amazing exemption, Division V, the Motor Carrier Division of the Commission, refused to allow it. The Commission at the same time refused to exempt from its new rules motor carriers whose operations were shown to be substantially identical with those performed by railroad and express carriers which the Commission left free from the burdens of the rules. Since the railroads and the independent motor carriers are in competition, it is not strange to find the railroads arguing here that while the railroads' exemption should be sustained, the new rules should be applied in all their vigor to the independent motor carriers. I know of no power which the Commission has to allow railroads which

---

[7] This statutory agricultural exemption reflects a congressional belief that ". . . it would be better for the Congress to decide what should be exempted rather than to leave it in the hands of the Commission that might nullify the entire intentions of Congress . . . ." 79 Cong. Rec. 12225.

engage in the motor carrier business exemptions and preferences which are denied completely motor carriers not owned by railroads.

The Commission's rules as a whole fashion broad new national transportation policies different from and in conflict with those Congress adopted after mature consideration. I would reverse the judgments of the District Courts and direct that the rules be set aside as beyond the Commission's authority.