### ASSOCIATION OF AMERICAN RAILROADS, Petitioner,

v.

### INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,

Institute of Scrap Iron & Steel, Inc. and Louis Padnos Iron and Metal Co., Intervenors.

No. 77–1113.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 14, 1978.

Decided May 29, 1979.

Rehearing Denied June 28, 1979.

---

7. App. 4–5; Brief for Appellant at 33–35.

8. *See* note 5 *supra.*

John B. Norton, Washington, D. C., with whom Thomas C. Dorsey, Washington, D. C., was on the brief, for petitioner.

Alan J. Thiemann, Atty., I. C. C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel, Charles H. White, Jr., Associate Gen. Counsel, Henri F. Rush, Atty., I. C. C., and Daniel J. Conway, Atty., Dept. of Justice, Washington, D. C., were on the brief, for respondents.

Also Carl D. Lawson, Atty., Dept. of Justice, Washington, D. C., entered an appearance for respondent.

Abraham A. Diamond, Chicago, Ill., was on the brief, for intervenor, Louis Padnos Iron and Metal Co.

Howard Gould, David Reichert and Stephen D. Strauss, Cincinnati, Ohio, were on the brief, for intervenor, Institute of Scrap Iron & Steel, Inc.

Before ROBINSON, MacKINNON and ROBB, Circuit Judges.

MacKINNON, Circuit Judge:

In *In re Net Weights for Determining Losses—Scrap Iron and Steel,*[1] the Interstate Commerce Commission ("Commission"), acting pursuant to the Administrative Procedure Act, 5 U.S.C. § 553(c) (1976),[2] promulgated the following regulation to supplement its existing rules governing loss and damage claims by shippers against railroads:

> Where weight is used as a measure of loss in rail transit of scrap iron and steel and actual tare and gross weights are determined at origin and destination, the settlement of claims shall be based upon a comparison of net weights at origin and destination.

The proceedings which resulted in the issuance of the above rule were initiated in response to a petition for investigation filed by Louis Padnos Iron & Metal Company, a shipper of scrap iron and steel and an intervenor in this case. The petition requested the Commission to examine the legality under section 20(11) of the Interstate Commerce Act ("Act")[3] of the practices of certain railroads in regard to settling claims for scrap iron and steel[4] lost in transit.

The practice in question involved the railroads determining the amount of scrap lost in transit by ascertaining the difference between the gross weights of the shipment at the points of origin and destination, and then reducing this amount by some percentage, varied in the judgment of the railroad[5] and allegedly designed to account for the inaccuracies of gross weight measurements, in arriving at a settlement figure.

The basis for Padnos' objection to this method of settling shippers' claims was that it did not comply with section 20(11) which mandates that common carriers "shall be liable . . . . for the *full actual loss, damage, or injury*"[6] to property incurred during the course of transit. The obvious objection to the railroads' practice was that the use of gross weights reduced by some more or less arbitrary percentage was an unjustifiably inaccurate means of determining "full actual loss." As discussed in somewhat greater detail below, where we consider whether the order here challenged was "arbitrary and capricious," the intervenor made a strong case for the illegality of the railroads' gross-weight calculations.

---

1. I.C.C. Docket No. Ex Parte No. 263 (Sub-No. 2) [hereinafter Ex Parte No. 263], 352 I.C.C. 402 (1976).

2. 5 U.S.C. § 553(c) (1976) provides:

    (c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When the rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

3. Section 20(11) of the Act, 49 U.S.C. § 20(11) (1970) provides:

    (11) Liability of initial and delivering carrier for loss; limitation of liability; notice and filing of claim.

    Any common carrier, railroad, or transportation company subject to the provisions of this chapter receiving property for transportation from a point in one State or Territory or the District of Columbia to a point in another State, Territory, District of Colum-

bia, or from any point in the United States to a point in an adjacent foreign country shall . . . be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, *for the full actual loss, damage, or injury to such property* . . . (Emphasis added).

4. The Order of the I.C.C. extended only to the transportation of scrap iron and steel, with the proviso that it might later be expanded to include other commodities. Ex Parte No. 263, 352 I.C.C. at 403; JA 150.

5. The claims settlements were less a matter of compromise than contracts of adhesion. The amount of the losses were usually rather small, under $100.00, *see, e.g.,* verified statement of S. K. Pandos, JA 28, and it was not worthwhile for many to go to court to obtain full compensation for their loss. This was particularly true of many smaller scrap dealers. As a result, their only reasonable opportunity for payment was to accept the railroads' "settlement offer," *see* Brief for Intervenor Institute of Scrap Iron and Steel, Inc. at 7.

6. *See* note 3, *supra.*

Before the Commission, the railroads defended this practice. in large part because the ability to vary the reduction factor gave them "greater flexibility" in dealing with claims.[7] This insistence on "flexibility," however, seems tacitly to concede that the settlements thus achieved did vary and were generally inaccurate, thus violating section 1(6) of the Act prohibiting "unjust . . . practice[s]" in rail rates, which by section 12(1)(a) the Commission is "required . . . to enforce . . . ."

The undisputed evidence before the Commission established that as scrap iron and steel are generally shipped in open-topped cars[8] ("gondolas" in railroad parlance), the comparison of gross weights at origin and destination inevitably tends to be an imprecise measure of the "full actual loss" due to such sources of inaccuracy as precipitation and other forms of foreign matter potentially affecting the car's weight.[9] We are also mindful of a point apparent from the hearing record, but not pressed, that shippers may be the ones at fault when they load with clamshell loaders that scoop up bricks, concrete, plaster, wood, dirt, etc. along with the iron and steel, and then leave the debris in the car when they unload with crane operated magnets that remove only iron and steel. The operation of the rule, however, is a matter for the future.

Based on the statements presented by Pandos, the Association of American Railroads (AAR), the Institute of Scrap Iron and Steel, and others, the Commission determined that § 20(11) mandated the use of an accurate method for assessing the amount of loss.[10] Obviously that method which eliminates as many extraneous factors as possible from weight comparisons at origin and destination would provide for the most accurate determination of "actual loss." Thus, the net weights comparison set forth, *ante*, page —— of 195 U.S.App.D.C., page 991 of 600 F.2d, was adopted since comparing gross weights eliminates none of the possible inaccuracies arising from such factors, and, at least in theory, a comparison of net weights would do so.

In fact, since net weights are determined not by direct weighing of the lading, but by subtracting tare (the weight of the car) from gross weight, a comparison of "net weights" does not eliminate all extraneous factors. For example, if the car containing the shipment is not completely unloaded at destination before the "tare" weight is determined, it will appear that there has been a net weight loss which actually is not the case. The Commission, however, was of the opinion that these potential inaccuracies were less significant than those affecting comparisons of gross weights.

Under the Commission rule, where actual tare and gross weights were taken at origin and destination, net weights must be used as the basis for determining actual loss. However, in response to the protestations of the Association of American Railroads the Commission did permit the railroads to use a reasonable "tolerance factor" to adjust net weight figures because of discrepancies between scales at origin and destination,[11] and also allowed the carrier the option of obtaining a third weighing at the destination to corroborate the accuracy of the initial net loss determination. In the same order in which the challenged regulation was established, the Commission also instructed the railroads to cease and desist from using or applying their current methods for settling damage and loss claims to

---

7. *See* Petitioners' Brief at 17; Initial Statement of Association of American Railroads before the Interstate Commerce Commission, JA 101–107.

8. *See, e.g.,* Verified Statement of Seymour Pandos JA 4; *cf.* Ex Parte No. 263 at 404–405.

9. Ex Parte No. 263; 352 I.C.C. at 405; JA 151.

10. *Id.,* 352 I.C.C. at 410; JA 154.

11. The Commission has long recognized that the use of scale weight tolerances in not unreasonable, *e. g.,* Northwest Traffic and Service Bureau v. Chicago, M. & St. P. Ry. Co., 47 I.C.C. 549, 556 (1917); Weight Tolerances Rule, 192 I.C.C. 71, 76 (1933).

the extent that these practices were inconsistent with the net-weight regulation.[12]

The AAR seeks to invalidate the ICC's regulation on the grounds that its promulgation was not within the Commission's authority, and that even if enacting the regulation was a valid exercise of the ICC's jurisdiction, the content of the rule is unreasonable. We find both these arguments without merit and affirm the Commission's order in its entirety.

## I

## THE COMMISSION'S AUTHORITY

The net weights regulation involved here applies only to voluntary settlement of loss and damage claims. It does not apply when such claims are litigated in court. If a railroad does not want to settle a claim in accordance with the net weight regulation, it is free to take the matter to court, where it can offer into evidence all relevant facts. Thus, in this case, the Commission merely seeks court recognition of the rather narrow authority to promulgate regulations governing voluntary settlements of loss and damage claims.

In support of the Commission's position that it had the requisite authority to promulgate the net weight regulation, two different rationales are advanced. First, the Commission relies upon its recent decision in *Ex Parte No. 263, Loss and Damage Claims*, 340 I.C.C. 515 (1972) [hereinafter Loss and Damage Claims].[13] In that proceeding the Commission asserted, without challenge from the railroads, a jurisdiction to promulgate *regulations* implementing

the Act provided that such regulations did not interfere with the actual determination of the merits or the measure of damages in particular loss and damage claims, which the ICC conceded were questions cognizable only in the courts.[14] Petitioners acknowledge the validity of the rule-making jurisdiction over settlements claimed in *Loss and Damage Claims*.[15] They formulate their argument around the issue of whether the net-weight regulation is more properly characterized as "substantive" or "procedural." The Commission acknowledged that substantive regulations are beyond the scope of its jurisdiction as asserted in *Loss and Damage Claims*, but contends it is authorized to issue procedural regulations governing settlements.

A second approach, elaborated at length by intervenor Padnos, ignores the questions of the substantive or procedural nature of the net-weight rule and relies on a more indeterminately based general rule-making power vested in the Commission to justify its jurisdiction.[16] In *Loss and Damage Claims*, the ICC, in addition to developing the substantive/procedural dichotomy mentioned above, alluded to this second rationale for maintaining its rule-making authority in this case:

The Congress, recognizing that urgent and complex matters are involved in attempting to regulate the interstate transportation of passengers and property, and realizing also that numerous unforeseen problems could arise in the course of such regulation, has entrusted to us, in section 12(1) of the Act and cognate provisions in parts II, III, and IV thereof, broad regu-

---

**12.** Ex Parte No. 263, 352 I.C.C. at 422; JA 160.

**13.** In Ex Parte 263 the Commission relied almost exclusively on the decision in *Loss and Damage Claims* as justification for its jurisdiction: "Jurisdiction in this area has been discussed at length in Loss and Damage Claims, supra [340 I.C.C.] page 539–546 . . . The Commission concluded similarly in this subnumbered proceeding of Ex Parte No. 263 that our jurisdiction and responsibility in this area are clear and that we would be remiss if we failed to exercise our jurisdiction over the processing of claims." Ex Parte No. 263 at 409; JA 153.

**14.** *Loss and Damage Claims*, 340 I.C.C. 515, 539 (1972).

**15.** Petitioners' Brief at 8–12.

**16.** Pandos goes so far as to claim that "there is no logical reason to withhold from the Commission the right to adjudicate loss and damage claims," Brief for Intervenor Pandos, Inc. at 13. As the Commission itself does not claim such authority, we do not consider this suggestion.

latory power to administer and execute the provisions of the statute and to carry out the congressionally declared national transportation policy. [49 U.S.C. preceding §§ 1, 301, 901, and 1001].

340 I.C.C. at 542–43.

█ Under this analysis, although section 12(1) does not contain an express grant of rulemaking authority,[17] it is argued that the fact that sections in other parts of the Act to which it is "functionally equivalent" have been held to convey such authority (it being expressly stated, *e.g.*, 49 U.S.C. §§ 304(a)(6), 904(a), 1003(a)), implies that a similar authority should be inferred to exist

in the context of 12(1).[18] *See American Trucking Ass'ns v. United States*, 344 U.S. 298, 311–312, 73 S.Ct. 307, 97 L.Ed. 337 (1953). Furthermore, the general principle that when an agency is entrusted with the supervision of an industry its power to issue rules necessary to do so should be broadly construed, *American Trucking Ass'ns, supra*, 344 U.S. at 309–312, 73 S.Ct. 307; *General Tank Car Corp. v. El Dorado Terminal Co.*, 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361 (1940), is asserted in support of the Commission's authority to promulgate the net weight rule in exercise of the statutory mandates of section 1(6)[19] and 20(11).

17. Section 12(1) of the Act, 49 U.S.C. § 12(1) (1970) provides:

§ 12. Authority, duties, and proceedings of Commission; witnesses; exception from applicability of chapter for persons, class of persons, etc.; procedures for establishment and revocation

Authority, duties, and proceedings of Commission, witnesses

(1)(a) The Commission shall have authority, in order to perform the duties and carry out the objects for which it was created, to inquire into and report on the management of the business of all common carriers subject to the provisions of this chapter, and to inquire into and report on the management of the business of persons controlling, controlled by, or under a common control with such carriers, to the extent that the business of such persons is related to the management of the business of one or more such carriers, and the Commission shall keep itself informed as to the manner and method in which the same are conducted. The Commission may obtain from such carriers and persons such information as the Commission deems necessary to carry out the provisions of this chapter; and may transmit to Congress from time to time such recommendations (including recommendations as to additional legislation) as the Commission may deem necessary. *The Commission is authorized and required to execute and enforce the provisions of this chapter*; and, upon the request of the Commission, it shall be the duty of any United States attorney to whom the Commission may apply to institute in the proper court and to prosecute under the direction of the Attorney General of the United States all necessary proceedings for the enforcement of the provisions of this chapter and for the punishment of all violations thereof, and the costs and expenses of such prosecution shall be paid out of the appropriation for the expenses of the courts of the United States; and for the purposes of this

chapter the Commission shall have power to require, by subpoena, the attendance and testimony of witnesses and the production of all books, papers, tariffs, contracts, agreements, and documents *relating to any matter under investigation*. (Emphasis added).

18. Government's Brief at 10. (The I.C.C. and the United States, named as a respondent pursuant to 28 U.S.C. § 2322 (1970), filed a joint Brief herein referred to as the Government's Brief).

19. Section 1(6) of the Act, 49 U.S.C. § 1(6) (1970) provides:

§ 1, par. (6). Classification of property for transportation; regulations and practices; demurrage charges

It is made the duty of all common carriers subject to the provisions of this chapter to establish, observe, and enforce just and reasonable classifications of property for transportation, with reference to which rates, tariffs, regulations, or practices are or may be made or prescribed, and just and reasonable regulations and practices affecting classifications, rates, or tariffs, the issuance, form, and substance of tickets, receipts, and bills of lading, *the manner and method of presenting*, marking, packing, and delivering property for transportation, the facilities for transportation, the carrying of personal, sample, and excess baggage, and all other matters relating to or connected with the receiving, handling, transporting, storing, and *delivery of property* subject to the provisions of this chapter which may be necessary or proper to secure the safe and prompt receipt, handling, transportation, and delivery of property subject to the provisions of this chapter upon just and reasonable terms, and every *unjust and unreasonable* classification, regulation, and *practice is prohibited and declared to be unlawful*. Demurrage charges shall be computed, and rules and regulations relating to

Although the second argument advanced in support of the Commission's authority to require the use of net weights is not without force, our conclusion that the regulation in question is plainly procedural makes it unnecessary to reach the second issue.[20] By statute: "The Commission is . . . authorized and required to execute and enforce the provisions of [that]′ . . . part [of the Interstate Commerce Act applicable to carriers by rail]." 49 U.S.C. § 12(1)(a). This includes the declared ". . . national transportation policy of the Congress to provide for the fair and impartial *regulation* of all modes of transportation subject to the provisions of the [Interstate Commerce] Act, so administered as [*inter alia*] . . . to encourage the establishment and maintenance of reasonable charges for transportation charges *without unjust discrimination, undue preferences or advantages* . . . . All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declarations of policy." Act of September 18, 1940, c. 722, Title I, § 1, 54 Stat. 899. 49 U.S.C. preceding § 1 (1970). (Emphasis added).

In the course of the present rule making proceeding, the Commission found instances of unjust discrimination, undue preferences and advantages in the railroads' settlement procedures. This discrimination resulted from the statutory liability of "full actual loss," not being paid in a great many instances. Instead, "[s]ettlement offers of 25, 50, or 75 percent of claims appear[ed] to be based more on the bargaining position of the parties than the liability of the carrier for "full actual loss" under § 20(11), 352 I.C.C. 413. In other instances the amount of loss for which the carrier was responsible was not determined accurately. *Id.,* 410. In sum, the Commission found that the "flexibility" in claims' settlements, that the railroads acknowledge and support, was an improper endeavor arbitrarily and preferentially to limit claims liability. *Id.,* 410.

The net weight regulation in effect prescribes an *evidentiary* rule that net weight, whenever it is available, is to be used in all settlements in preference to gross weight figures to determine "full actual loss" based on weight. It is true that some evidentiary rules may be substantive, but in our judgment the rule here is not. In general, substantive law is that which *creates* underlying rights and duties,[21] while procedural law includes that which is embraced by *evidence* as well as pleading and practice.[22] In the instant case, the substantive law embodied in the Interstate Commerce Act declares, creates, and defines shippers' right to recover their "full actual loss," and the corresponding duty of the railroad to compensate all shippers to that extent, 49 U.S.C. § 20(11). The net weight regulation, an endeavor by the Commission to carry out the National Transportation Policy *supra,* and the responsibility imposed by the *requirement* of· § 12(1) of the Act "to execute and enforce the provision" mandating the payment of "full actual loss," § 20(11), does not add any·substantive liability to the railroads' obligation. Rather,

---

such charges shall be established, in such a manner as to fulfill the national needs with respect to (a) freight car utilization and distribution, and (b) maintenance of an adequate freight car supply available for transportation of property. (Emphasis added).

20. Both the Commission and petitioner concede that procedural rules regarding settlements may be promulgated by the Commission. We agree on this point, and uphold the rule because it is procedural. We do not necessarily subscribe, however, to the view that only procedural rules, and not substantive rules, are permissible. Since we decide this case on the narrower grounds, we leave the other question for another day.

21. *Bagsarin v. Parker Metal Co.,* 282 F.Supp. 766, 769 (D.C.Ohio 1968); *Schultz v. Gosselink,* 260 Iowa 115, 148 N.W.2d 434, 436 (1967); *Meagher v. Kavli,* 251 Minn. 477, 88 N.W.2d 871, 879–880 (1958); *Spencer Kellogg & Sons, Inc. v. Lobban,* 204 Tenn. 79, 315 S.W.2d 514, 518 (1958); *Thiele v. City and County of Denver,* 135 Colo. 442, 312 P.2d 786, 793 (1957).

22. *Kellman v. Stoltz,* 1 F.R.D. 726, 728 (D.C. Iowa 1941); *Jones v. Garrett,* 192 Kan. 109, 386 P.2d 194, 198 (1963); *Intagliata v. Shipowners & Merchants Towboat Co.,* 151 P.2d 133, 139 (Cal.App.1944); *Washington National Insurance Co. v. McLemore,* 163 So. 773, 775 (La. App.1935); *Sackheim v. Pigueron,* 215 N.Y. 62, 109 N.E. 109, 112 (1915).

this regulation merely prescribes the evidentiary method that the Commission, after full proceedings, found best suited to determine "full actual loss" for settlement purposes.[23] Theoretically, using net weights or gross weights to determine loss should produce precisely the same result, certainly one method is not *substantively* different from the other. The Commission has simply determined that mechanically the former is more accurate. Far from altering the railroad's substantive liability, the net weight regulation does no more than require the extent of this liability to be determined by the best information available. The regulation is thus basically procedural.

Not only do the petitioners concede that the regulation is authorized if it is procedural,[24] but also, given Congress' broad delegation to the ICC of the responsibility for the enforcement of the National Transportation Policy, *supra; e.g., Board of Trade of Kansas City, Mo. v. United States,* 314 U.S. 534, 62 S.Ct. 366, 86 L.Ed. 432 (1942), we would not adopt a narrow view of the Commission's authority to establish regulations so intimately connected to the discharge of its statutory responsibilities as the net weight regulation is to the determination of the amount of "full actual loss."

In *Secretary of Agriculture v. United States,* 350 U.S. 162, 76 S.Ct. 244, 100 L.Ed. 173 (1956), the Commission, after finding with respect to claims for eggs damaged in transit, that estimates of higher-percentage pre-carrier damage were incorrect, by order authorized the railroads to include in their tariff schedules the following tolerance provision:

On eggs placed in packages at rail point of origin of the shipment, no claim shall be allowed where the physical damage to the egg at destination does not exceed 3% of the contents of the packages containing damaged eggs. Where damage exceeds 3%, claims shall be allowed for all damage in excess of 3%, if investigation develops carrier liability.

Exception.—Where bona fide certificates of Federal or State egg inspection agencies showing extent of physical damage to eggs determined at rail point of origin of the shipment immediately prior to tender for rail transportation indicate the actual shell damage to be other than 2%, the percentage of actual damage as shown on such certificates, plus 1% shall be used in lieu of 3% specified in this Section.

350 U.S. at 164, 76 S.Ct. at 246. This order amounts to a regulation of the railroads' handling of such claims and is not substantially different from the rule here applicable to claims for scrap iron and steel allegedly lost in transit. In the case of egg claims the Commission authorized a tolerance of 3% for eggs packaged at rail point of origin; with respect to scrap iron and steel claims the Commission provided that where net weights are determined at origin and destination the settlement of loss claims must be based thereon. In both instances, the Commission regulated the payment of claims. In the egg case, the Supreme Court did not question the authority of the Commission to take the action it did.[25] We similarly find no basis for ques-

---

**23.** Petitioners claim that the net-weight rule will somehow "replace concrete facts" in arriving at settlements, and thus have a substantive effect upon the assessment of liability, Petitioners' Brief at 12. This argument borders on the frivolous. The petitioners do not dispute, and it is Congress not the I.C.C. that has mandated, that the figure to be ascertained is "full actual loss." If the Commission attempted to require—in the absence of any Congressional mandate—that compensation be paid for the full loss, it would indeed be trespassing into the area of substantive rule-making. As it is, however, the I.C.C. has only prescribed the manner in which, in instances of settlement, the figure

mandated by the Act is most accurately calculated.

**24.** *See* page —— of 195 U.S.App.D.C., page 993 of 600 F.2d, *supra.*

**25.** The Court reversed the Commission on the other grounds that the evidence was insufficient to support a conclusion that the manner in which the tolerances would apply would not result in an unlawful limitation of the liability of railroads.

There are other numerous examples of rules issued by the Commission in other contexts which are at least, if not more, "substantive"

tioning the Commission's authority in this case.

We also note, but need not rely on, the following observations. The Interstate Commerce Act does not specify all of the multitudinous facets of carrier transportation that are to be administered under the Act. It leaves room for the Commission to exercise its discretion and because of that vested discretion, it may be forcefully argued that the Commission is empowered to promulgate such reasonable rules and orders it finds to be necessary to carry out its statutory duties, even without an explicit grant of rulemaking power. Professor K. Davis in his Administrative Law Treatise (Supp.1970) states the general rule to be:

> Any officer who has discretionary power necessarily also has the power to state publicly the manner in which he will exercise it, and any such public statement can be adopted through a rule-making procedure, whether or not the legislative body has separately conferred a rule-making power on the officer.

§ 6.16, p. 285. *See, e.g., Electrolux Corporation v. Miller*, 286 N.Y. 390, 393, 36 N.E.2d 633, 636 (1941). *See also, British Caledonian Airways, Ltd. v. CAB*, 190 U.S. App.D.C. 1, 584 F.2d 982 (1978).

More recent writers in the field have described in even broader terms the implicit power of agencies to issue such rules, substantive or procedural, as may be necessary to the effective exercise of their authority:

> . . . all administrative agencies, whether regulatory or law enforcing, except where an express statutory provision is to the contrary, have substantive rule making power within the limits of their statutory authority.

Mezines, Stein, Gruff, Administrative Law § 16.03[1] at 16–25; *cf. National Petroleum*

*Refiners Ass'n v. FTC*, 157 U.S.App.D.C. 83, 482 F.2d 672 (1973), *cert. denied*, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974); Wright, *The Courts and the Rule Making Process: The Limits of Judicial Review*, 59 Corn.L.Rev. 375–377 (1974). Sound logic supports these observations, but we rely on the previously stated procedural grounds in holding that the net weight regulation to be applied in settlements was justifiably promulgated by the Commission in discharge of its statutory obligation to enforce the obligation of railroads to compensate shippers for their full actual loss, 49 U.S.C. §§ 12(a), 20(11).

II

## THE NET WEIGHT REGULATION IS NOT ARBITRARY OR CAPRICIOUS

■ Petitioners' argument that the net-weight regulation is arbitrary and capricious because net weights are no more, and may be less accurate, than gross weights is easily answered. The scope of review by this court of orders by the Commission is narrow, and even if we might question whether gross weights tended to be more accurate than net weights, we are not at liberty to substitute our judgment for that of the ICC on that matter. *United States v. Pierce Auto Freight Lines, Inc.*, 327 U.S. 515, 535–536, 66 S.Ct. 687, 90 L.Ed. 821 (1946); *Rochester Telephone Corp. v. United States*, 307 U.S. 125, 138–140, 59 S.Ct. 754, 83 L.Ed. 1147 (1939); *Ethyl Corp. v. EPA*, 176 U.S.App.D.C. 373, 405–410, 541 F.2d 1, 33–38 (1975), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976); *National Ass'n of Food Chains, Inc. v. ICC*, 175 U.S.App.D.C. 346, 351–352, 535 F.2d 1308, 1313–1314 (1976). Moreover, we find abundant support for the position the Com-

---

than the regulation here challenged. For example, the Commission has determined that when settling a claim for damage to household goods, the replacement cost, not the original cost shall be used as a base figure, Transportation of Household Goods in Interstate Commerce, 49 C.F.R. § 1056.16(d). In dealing with grain losses, the Commission has promulgated a rule that if there is a difference in weight based on supervised scale measurements at origin and

destination, a prima facie case of carrier's liability has been made out, but if the weighing are both taken on unsupervised scales no such case has been established, 40 Fed.Reg. 49341 (October 22, 1975); Practices and Policies in the Settlement of Loss and Damage Claims on Grain and Grain Products, 346 I.C.C. 33, 61 (1974). In the same rule concerning grain shipments, the Commission also established a ¼% tolerance for differences between scales.

mission has taken. Even if the judgment of the Commission were not entitled to deference we would be inclined to agree that net weight measurements tend to be a more accurate method of determining "full actual loss" than are gross weight figures.

During the hearing before the Commission,[26] all the evidence indicates that due to precipitation, rubbish, etc. gross weights were inaccurate measures of losses in transit.[27] These extraneous factors can be largely eliminated through the use of net weight rather than gross weight figures, and this fact alone would justify the Commission's order. Moreover, petitioners' own practices do not support their attempt to discredit the accuracy of net-weight figures, as it appears that the *railroads themselves use net weight to determine freight charges.*[28] Thus, the Commission's position not only has the strength of common sense, but also is supported by the practice of the railroads themselves. One can assume that the railroads desire an accurate reading of the amount of freight they are carrying.[29] We accordingly conclude that petitioners have not discharged the heavy burden of proving that the Commission in requiring the use of net weights had acted arbitrarily and capriciously.

A large part of the evidence presented by the petitioners before the Commission consisted of an enumeration of the hardships that would result from requiring the use of net weight in the determination of loss set-tlements.[30] That the AAR would attempt to support the use of gross weight by such policy arguments suggests that it also recognized the difficulty of arguing in favor of gross weight figures on the basis that they allowed more reliable calculation of the statutorily mandated "full actual cost" than net weight figures.

Petitioners' main argument before this court is that in transporting scrap iron and steel the lading itself is never weighed independently. Rather, the loaded and tare weights of the cars are determined. Thus, mandating the use of net weights requires four weighing—gross and tare at origin and destination—instead of only two—gross only at origin and destination. The AAR argues that by increasing the number of required weighings from two to four, the Commission's regulation simply interjects another possible source of error into the assessment process.[31] The ICC took consequence of the possibility of scale inaccuracies by allowing for a "reasonable tolerance" for variations in net weight.[32] Petitioners' point in this respect, however, is not totally frivolous. On the other hand, one would expect inaccuracies to arise not so much in discrepancies between different weighings made on the same scale, but in discrepancies between weighings made on different scales. It is thus hard to see how in practice the net weight rule would create a significantly greater potentiality for error than the use of gross weights [33] since differ-

---

**26.** The Commission did note that the amount of testimony received was "limited," Ex Parte No. 263, 352 I.C.C. at 403; JA 150.

**27.** Ex Parte No. 263, 352 I.C.C. at 410; JA 154.

**28.** Initial Statement of AAR before the I.C.C. p. 14; JA 95. Government's Brief at 11-12.

**29.** The Commission commented that it recognized that there would be a "loss of flexibility" in settling loss and damage claims as a result of its proscription of gross weight computation of loss, but regarded this loss of flexibility as "a positive good" in that it eliminated arbitrary limitations on loss claims. Ex Parte No. 263, 352 I.C.C. at 410; JA 154.

**30.** *See* Initial Statement of the AAR before the I.C.C. at 9–26; JA 90–107.

**31.** Petitioners' Brief at 14–17.

**32.** The Commission did not set any specific percentage limit on this "tolerance" but rather allowed the railroads themselves to set any reasonable figure, Ex Parte 263, 352 I.C.C. at 412; JA 155.

**33.** Petitioners urge that because of the recurrent problem of cars being only partially unloaded at the destination, the railroads will be held liable for what are in fact derelictions of the consignees. For example, if a consignee neglects to remove 1,000 pounds of scrap from a car, it will appear as if the railroad had lost that 1,000 pounds in transit. The Commission however, points out that by its order in *Consignees' Obligation to Unload Rail Cars,* 340 I.C.C. 405 (1972), it placed an affirmative obligation on consignees to unload cars fully, and

ent scales are also used for determining gross weights. What the AAR overlooks is that the major eradicable source of error in weighing loads carried in gondolas is the possibility of foreign matter being either deposited or removed from the cars between weighings. We cannot say that it was irrational of the Commission to consider that removing this source of error merited incurring the slight additional risk of mistake involved in requiring four instead of two weighings. Moreover, the Commission, through its allowance of a "reasonable tolerance" and the option of a third weighing has minimized the effect of this latter risk, while a gross weight system does nothing to reduce the possible error derived from the injection of foreign matter.

■ There is no allegation here that the Commission violated any principle of due process in the conduct of its hearing, and the petitioners were allowed ample opportunity to present their case; the Commission has not acted arbitrarily and capriciously simply because it was not convinced by their presentation. We dismiss the petition for review and affirm the Commission's order in its entirety.[34]

*So Ordered.*

that the railroads can protect themselves by forcing compliance by refusing to move the cars and charging demurrage until the cars are fully unloaded. Government's Brief at 12. This requirement could be easily enforced by the switching crew.

34. The Commission suggests that the railroads can protect themselves from any injustices by requiring consignees fully to unload cars, by providing for a reasonable tolerance for scale differentials, and by electing a third weighing at the destination. Because of this ability to avoid harm the Commission contends that the railroads have not demonstrated any "injury in

fact" and thus should be denied standing. However, since implementing such protections might prove bothersome and costly to the railroads, it appears that they might well be able to satisfy the "injury in fact" test, *see Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). In any event as we find the Commission's order clearly valid on the merits, we would exercise our authority to bypass difficult preliminary issues and dispose of cases on their merits, when the merits manifestly require a certain result, *see Kennedy v. Rabinowitz,* 376 U.S. 605, 607, 84 S.Ct. 919, 11 L.Ed.2d 940 (1964).