GLOBAL VAN LINES, INC., Wheaton Van Lines, Inc., and American Red Ball Transit Company, Inc., Petitioners,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.

REFRIGERATED TRANSPORT CO., INC., et al., Petitioners,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,

American Trucking Associations, Inc., et al., National Tank Truck Carriers, Inc., Intervenors.

Nos. 79–1185, 79–1264.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 11, 1980.

Decided July 2, 1980.

Stanley I. Goldman, Washington, D. C., with whom Alan F. Wohlstetter, Washington, D. C., was on brief, for petitioners in No. 79–1185.

Richard M. Tettelbaum, Atlanta, Ga., with whom Alan E. Serby and Bruce E. Mitchell, Atlanta, Ga., on brief, for petitioners in No. 79–1264.

James P. Tuite, Deputy Associate Gen. Counsel, I. C. C., Washington, D. C., with whom Robert S. Burk, Acting Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, I. C. C., John J. Powers, III, Asst. Chief, Antitrust Division and Robert Lewis Thompson, Atty., Dept. of Justice, Washington, D. C., were on brief, for respondents.

Harry C. Ames, Jr., and Elizabeth A. Purcell, Washington, D. C., were on brief for intervenor, Nat. Tank Truck Carriers, Inc. in No. 79–1264.

Nelson J. Cooney, Kenneth E. Siegel, Alan J. Thiemann, and Robert A. Hirsch, Washington, D. C., were on brief, for intervenor, American Trucking Associations, Inc., et al., in No. 79–1264.

Before TAMM, ROBB and MIKVA, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

Petitioners challenge newly promulgated Interstate Commerce Commission regulations governing leasing practices in the trucking industry. We find that the regulations are valid and affirm the Commission's order promulgating them.

## I. REGULATORY HISTORY

In 1973 the nation's independent (owner-operated) truckers experienced their winter of discontent. In a concerted protest, they shut down operations to protest a host of economic problems with which they were beset. The impact was sufficient to set in motion a series of congressional hearings on the plight of independent truckers.[1] The strike also motivated the Interstate Commerce Commission to commence its own hearings, staff studies, and eventually a rulemaking proceeding which resulted in the regulations here under review.[2]

---

1. *See Regulatory Problems of the Independent Owner-Operator in the Nation's Trucking Industry: Hearings Before the Subcomm. on Activities of Regulatory Agencies of the House Comm. on Small Business: Parts I, II, III,* 95th Cong., 2d Sess. (1976–1978). The hearings testimony is summarized in H.R. Rep. No. 1812, 95th Cong., 2d Sess. 9–23 (1978).

2. The Commission conducted a series of hearings in various cities including Atlanta, Boston, Chicago, Fort Worth, Philadelphia, San Francisco, and Washington, D.C. A total of 438 witnesses testified and hundreds of written statements were submitted. The results of the hearings are summarized in a report entitled: *Ex Parte No. MC-113, Public Response to Proposal for Improving Motor Carrier Regulation*

Under the existing scheme of federal regulation of the trucking industry, as established by Congress in the Interstate Commerce Act ("Act"), a carrier must receive operating authority from the Commission before engaging in most forms of interstate motor transportation for hire. 49 U.S.C. § 10921. Independent truckers usually own and operate one, or perhaps a few, trucks for hire. Because of the small size of their operations, they do not seek their own interstate operating authority; rather they lease their equipment and services to a regulated carrier, transporting interstate under the regulated carrier's operating authority and aegis.

Truck leases, which range in duration from three months to one year,[3] usually involve a split of gross revenue equalling 25 percent for the regulated carrier and 75 percent for the independent. H.R. Rep. No. 1812, 95th Cong., 2d Sess. 5–6 (1978) ("*House Report*"). The independent generally must cover his own costs, including fuel, insurance, emergency repairs, road taxes, etc. *Id.* In addition, many lease contracts require the independent to deposit in escrow with the regulated carrier an amount ranging from about $500 to $2,000 to insure performance and to cover repair expenses, license and permit costs, and any claims that might arise out of carriage of the goods. *House Report* at 11. Escrow accounts are generally maintained for a number of months after termination of the leasing contract, a practice defended on the

ground that claims are permitted to be made long after property has been transported.[4]

The various hearings uncovered a number of problems and abuses suffered by independent truckers. The owner-operators were found to be "caught in a continuing cost crunch," faced with rising costs, inflexible income, difficulties in obtaining long-term financing and questionable industry practices. *House Report* at 6–7. As a result of its own hearings, and at least partly in response to the prod from the congressional hearings,[5] the Commission commenced a rulemaking proceeding "to determine whether modified leasing rules . . . should be proposed." 42 Fed.Reg. 59984 (Nov. 23, 1977). The notice recited the previous congressional hearings, the staff studies and field hearings, and stated that "the Commission is inclined to the view that the establishment of minimum standards for leasing contracts is a desirable starting point for an overall revision of the existing leasing regulations." *Id.*

The notice invited comments on ten areas of inquiry into leasing practices.[6] After considering the first round of comments from numerous parties, the Commission proposed some specific regulations in July, 1978. *Lease and Interchange of Vehicles,* 129 M.C.C. 700 (1978), 43 Fed.Reg. 29812–18 (July 11, 1978). The proposed rules covered most of the areas set out for consideration

(December, 1977). As a result of the hearings the Commission initiated Ex Parte No. MC–43 (Sub-No. 7), *Lease and Interchange of Vehicles.*

3. D. Wyckoff & D. Maister, The Owner-Operator: Independent Trucker 85 (1975).

4. See, *e.g.,* 49 U.S.C. § 11707(e), providing that a carrier cannot allow less than nine months for shippers to file damage claims.

5. The summary paragraph in the notice of institution of rulemaking proceeding, 42 Fed.Reg. 59984 (Nov. 23, 1977), states that:

The Interstate Commerce Commission is initiating this rulemaking proceeding on the basis of a Bureau of Operations survey of motor carrier leasing practices completed on August 23, 1977, an ongoing study of owner-operators being performed by the Bureau of Economics, and evidence gathered during

recent congressional testimony and Commission field hearings on owner-operator problems.

6. The areas listed were: 1) Compensation for Equipment and Driver; 2) Payment by Authorized Carriers to Lessors for Transportation Services Rendered; 3) Providing Copies of Rated Freight Bills at Time of Settlement; 4) Responsibility of Authorized Carriers for Fuel Costs and Other Items Associated with Transportation Services Rendered by Lessors; 5) Insurance; 6) Payment of Detention Charges and Other Accessorial Charges to Lessors by Authorized Carriers; 7) License Plate Fee Proration; 8) Escrow Funds; 9) Safety Requirements; and 10) Additional Areas for Consideration. 42 Fed.Reg. 59984–85.

in the notice. Relevant to this petition for review, the Commission proposed that regulated carriers pay interest at rates comparable to those paid by commercial banks on funds held in escrow. The proposal also required the return of escrow deposits within 45 days after termination of the leasing arrangement. .

There followed another round of public comments, and the Commission issued its final order in January, 1979. *Lease and Interchange of Vehicles*, 131 M.C.C. 141 (1979). With respect to the regulations governing escrow accounts, the 45-day refund rule was made final by the Commission. 131 M.C.C. at 153. Because of complaints about the uncertainty of commercial bank interest rates, the rule proposed in the July, 1978 report was modified to require payment at a rate "at least equal to the average yield . . . on 91 day, 13 week Treasury bills." *Id.* The final rules were

scheduled to become operative on February 22, 1979, but a 30-day delay was allowed for the carriers to amend their procedures to comply with the new rules. Finally, on March 26, 1979, the new rules became effective.[7]

The history of the generation of the subject regulations illustrates how gradually the wheels of change turn in the regulated trucking field. Not until six years after the impetus of the independent trucker strike and protest did the Commission effect final changes in the regulations. Many of the final regulations were noncontroversial.[8] Others generated some disagreement but were not challenged on appeal.[9] However, petitioners assert that the regulations governing escrow accounts exceed the statutory authority granted the Commission under the Act and that they further are arbitrary and capricious. Despite the contentions of

7. The complete text of the final rule governing escrow funds is contained in 49 C.F.R. § 1057.-12(1) and provides as follows:
  (1) *Escrow funds*—If escrow funds are required, the lease shall specify:
  (1) The amount of any escrow fund or performance bond required to be paid by the lessor to the authorized carrier or to a third party.
  (2) The specific items to which the escrow fund can be applied.
  (3) That while the escrow fund is under the control of the authorized carrier, the authorized carrier shall provide an accounting to the lessor of any transactions involving such fund. The carrier shall perform this accounting in one of the following ways:
  (i) By clearly indicating in individual settlement sheets the amount and description of any deduction or addition made to the escrow fund; or
  (ii) By providing a separate accounting to the lessor of any transactions involving the escrow fund. The separate accounting shall be done on a monthly basis.
  (4) The right of the lessor to demand to have an accounting for transactions involving the escrow fund at any time.
  (5) That while the escrow fund is under the control of the carrier, the carrier shall pay interest on the escrow fund on at least a quarterly basis. For purposes of calculating the balance of the escrow fund on which interest must be paid, the carrier may deduct a sum equal to the average advance made to the individual lessor during the period of time for which interest is paid. The interest rate shall be established on the date the interest

period begins and shall be at least equal to the average yield or equivalent coupon issue yield on 91-day, 13-week Treasury bills as established in the weekly auction by the Department of Treasury.
  (6) The conditions the lessor must fulfill in order to have the escrow fund returned. At the time of the return of the escrow fund, the authorized carrier may deduct monies for those obligations incurred by the lessor which have been previously specified in the lease, and shall provide a final accounting to the lessor or all such final deductions made to the escrow fund. The lease shall further specify that in no event shall the escrow fund be returned later than 45 days from the date of termination.

8. Those regulations dealing with disclosure of the terms of the lease agreement were generally well received by all parties. *E.g.*, Rule 1, requiring specification of compensation, and Rule 7, requiring specification of the costs to be borne by each party, received virtually no negative comments. 131 M.C.C. at 144, 148.

9. The Commission made efforts to accommodate concerns expressed in response to the proposed rules. *E.g.*, as proposed, Rule 2 required payment to the lessor within 10 days after submission of necessary delivery documents. The final rule was modified to extend the payment period until 15 days after submission of the documents in response to comments that the 10-day period was too burdensome. 131 M.C.C. at 146.

petitioners, we hold that the changes instituted by the Commission are rationally supported and well within the statutory authority of the Commission.

## II. AUTHORITY OF THE COMMISSION

The seminal case on the Commission's authority to regulate leasing activities is *American Trucking Associations v. United States*, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953). Prior to Commission action in that case, carriers had generally used single-trip leasing, with compensation measured as a percentage of gross revenue derived from the single trip. The Commission abolished this practice, ordering that leases be of at least 30 days' duration and that compensation be calculated on other than a gross revenue basis. These rules were challenged on the ground that the Act did not contain any express delegation of power to regulate leasing practices, and that such power could not be implied from the separate provisions of the Act granting regulatory authority. Conceding the absence of express authority in the Act, the Supreme Court nevertheless rejected this attack, stating that "Our function . . . does not stop with a section-by-section search for the phrase 'regulation of leasing practices' among the literal words of the statutory provision." *Id.* at 309, 73 S.Ct. at 314. The Court took the position that "the promulgation of these rules for authorized carriers falls within the Commission's power, despite the absence of specific reference to leasing practices in the Act." *Id.* at 312, 73 S.Ct. at 315. In reaching this holding, the Court looked to the Commission's general regulatory authority, concluding that since the aim of the rules was to promote "the maintenance of sound transportation services" and to prevent conditions which may "frustrate the success of the regulation undertaken by Congress," the Commission's action was within its rulemaking power,

which is "coterminous with the scope of agency regulation itself." *Id.* at 310, 311, 73 S.Ct. at 315.

In 1956, shortly after the decision in *American Trucking*, Congress amended the Act to address specifically the subject of trip leasing. One part of the amendment clarified congressional intent that carriers of agricultural products, which are otherwise exempt from the operation of the Act, should also be exempt from regulations governing leasing arrangements. 49 U.S.C. § 11101(c).[10] The other part of the amendment enacted into law certain of the regulations upheld in *American Trucking*. 49 U.S.C. § 11107.[11] The Commission was specifically authorized to require written leases governing transport of non-exempt products, and to promulgate regulations necessary to assure full direction and control of leasing operations by the regulated carriers. *Id.* Petitioners interpret this amendment as delimiting the authority of the Commission with respect to regulation of leasing. They argue that this is all the Commission is authorized to do, and that the present regulations, dealing with particular aspects of escrow accounts, overstep the boundaries of Commission authority.

Petitioners' restrictive interpretation of the 1956 amendment is incompatible with the overall structure of the Act, the legislative history surrounding the amendment, and the holding in *American Trucking*. The section of the Act dealing with the general powers of the Commission, 49 U.S.C. § 10321(a), provides that "Enumeration of a power of the Commission in this subtitle does not exclude another power the Commission may have in carrying out this subtitle." This is entirely consistent with the holding of *American Trucking* that the Commission can regulate even in the absence of express statutory authority, so long as the regulations are reasonably designed to carry out the overall purposes of the Act.

---

**10.** The Act was revised and recodified without substantive change, and enacted as 49 U.S.C. § 10101 *et seq.* on October 17, 1978, Pub.L. No. 95–473, 92 Stat. 1337. 49 U.S.C. § 11101(c)

was former section 204(f) of the Act, formerly codified at 49 U.S.C. § 304(f).

**11.** Former section 204(e) of the Act, formerly codified at 49 U.S.C. § 304(e).

Absent an express statutory limitation, the Commission's authority is not restricted to only the powers enumerated in § 11107.

Furthermore, there is nothing in the legislative history of the 1956 amendment to indicate that Congress intended to restrict the plenary power of the Commission recognized in *American Trucking*. Indeed, just the opposite intent is revealed. One of the objections raised to the amendment in the Senate Hearings was that "it would take from the Interstate Commerce Commission the power to regulate trip leasing." *Trip Leasing, Report of the Comm. on Interstate and Foreign Commerce*, S.Rep. No. 1271, 84th Cong., 1st Sess. 5 (1955) ("*Senate Report*"). The objection was responded to by noting that the restrictions on Commission power were only as to exempt carriers, whose concerns Congress was attempting to allay in passing the amendments. The view was expressed that this would "leave the Commission free to regulate the carriage of goods on the public highways, a duty imposed upon it by law." *Id.*

With respect to the part of the amendment that codified the regulations approved in *American Trucking*, the *Senate Report* states, "While it is true that the courts have held that some of this authority already rests with the Commission, still it is believed advisable to make them law by enactment rather than by court decision." *Id.* at 6. This language in no way indicates any congressional intent to limit the general regulatory powers of the Commission. Rather it was Congress' purpose in enacting the amendment "that the authority of the Interstate Commerce Commission to properly regulate motor carriers be maintained." *Id.* Thus, so long as the regulations can be justified as reasonably related to the purposes of the Act, they cannot be objected to as being outside the Commission's jurisdiction. *See Mourning v. Family Publications Service*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973); *Permian Basin Area Rate Cases*, 390 U.S. 747, 776, 88 S.Ct. 1344, 1364, 20 L.Ed.2d 312 (1968).

The regulations here under attack were promulgated in response to serious financial problems affecting the nation's independent truckers. It is estimated that there are over 100,000 independent truckers generating from $4 to $6 billion in gross revenues each year. D. Wyckoff and D. Maister, The Owner-Operator: Independent Trucker 12 (1975). These truckers constitute a substantial portion of the trucking industry, accounting for up to 40 percent of all intercity truck freight movements in the United States. *House Report* at 5. The difficulties undermining the economic viability of independent truckers thus create a threat to the health and stability of the trucking industry as a whole. Like the rules approved in *American Trucking*, the purpose of the present regulations "is to protect the industry from practices detrimental to the maintenance of sound transportation services consistent with the regulatory system." *American Trucking*, 344 U.S. at 310, 73 S.Ct. at 314. As such, they are within the scope of the Commission's authority and, if rationally supported, must be upheld. *United States v. Allegheny-Ludlum Steel Corp.*, 406 U.S. 742, 749, 92 S.Ct. 1941, 1946, 32 L.Ed.2d 453 (1972).

## III. THE 45-DAY REFUND RULE

The prevalent practice in truck leasing has been to require independent truckers to deposit a specified sum in escrow with the regulated carrier. The various investigations by Congress and the Commission flagged these accounts as a major source of problems for the independents. Delays in obtaining refund of the escrow deposits create serious cash-flow problems for the independent who wants to enter a new agreement but has substantial sums tied up in escrow funds still pending from prior agreements. Sometimes, complained the independents, the deposit was not given back at all. 129 M.C.C. at 726; *House Report* at 11.

In the first notice of proposed regulation, the Commission suggested a 30-day limit on return of escrow deposits. 42 Fed.Reg. at 59985. Following comments, the time was extended in the interim rule to 45 days, 129

M.C.C. at 742, 43 Fed.Reg. at 29817, and after another round of comments the 45-day rule was adopted by the Commission as final. 131 M.C.C. at 153. Some of the carriers complained in their comments to the Commission that the 45-day time limit was too short since, in some cases, shippers have up to nine months after transport to make claims for damages. 131 M.C.C. at 154. However, the testimony before the Commission on this issue was scant.[12] There was no evidence presented as to the frequency of claims filed beyond the 45-day period, and many of the carriers commenting expressed their agreement with the period chosen by the Commission.[13]

The Commission was faced with the job of balancing the possible harm to regulated carriers by a foreshortened refund schedule against the harm suffered by independent truckers from extended delays in getting refunds. It is well established that the Commission "must be free, within the limitations imposed by pertinent constitutional and statutory commands, to devise methods of regulation capable of equitably reconciling diverse and conflicting interests." *Per-*

*mian Basin*, 390 U.S. at 767, 88 S.Ct. at 1360. It is not the role of this court to second-guess the Commission and impose our own resolution of such conflicts. Our role is limited to determining whether the Commission's decision is within the "zone of reasonableness." *Id.*; *FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 585, 62 S.Ct. 736, 742, 86 L.Ed. 1037 (1942). The 45-day rule here under review is clearly within that zone. The Commission could have chosen to balance the scales more heavily on the side of the independents or the regulated carriers, but the decision as to where that balance should be struck is the very essence of administrative discretion with which this court may not meddle.

## IV. THE INTEREST RULE

In addition to holding escrow monies for extended periods of time, many of the regulated carriers did not pay interest on the money while it was in escrow.[14] The Commission found this practice to be inequitable and determined that interest should be paid on amounts held.[15] With this decision, peti-

---

**12.** Petitioner Global Van Lines stated in its comment:

> We submit that the last requirement, *viz.*, that escrow funds be returned within 30 days of a lease should not be made applicable to household good carriers. In the household goods operation, the escrow fund must be retained for at least 180 days to allow settlement of all claims that might be attributed to a particular owner-operator. The extra time should be allowed because many shippers do not file claims within 30 days after delivery.

Joint Appendix (J.A.) at 67.

There were no details supplied as to the experience of the company with respect to the filing of such claims. Although several other carriers submitted similar statements, for the most part they simply referred to the statutory provision that claims may be filed for up to 9 months as the sole reason for disagreeing with the shorter time period proposed by the Commission. *See, e.g.*, comments of: Stevens Van Lines, J.A. at 36; Aero Mayflower Transit Co., J.A. at 51–52; The American Movers Conference, J.A. at 69; Movers' & Warehousemen's Ass'n of America, J.A. at 71; Movers Round Table, J.A. at 73–74; and Bekins Van Lines Co., J.A. at 78.

**13.** Carriers expressing agreement with either a 30-day or 45-day time limit include: Bayview

Trucking, Inc., J.A. at 34; Bray Lines Inc., J.A. at 38–39; Mid Seven Transportation Co., J.A. at 41; Aero Liquid Transit, Inc., J.A. at 45; Willis Shaw Frozen Express, Inc., J.A. at 55; Crete Carrier Corp. & Shaffer Trucking, Inc., J.A. at 60; and The Maxwell Co., J.A. at 62.

**14.** A Commission staff study revealed that 23 percent of the owner-operators surveyed received interest on their escrow accounts. 129 M.C.C. at 727.

**15.** As proposed in the interim decision, the regulations required interest to be paid on "the average daily balance in the escrow fund on a quarterly basis." 129 M.C.C. at 725, 43 Fed. Reg. at 29817. Several carriers objected to this proposal on the ground that escrow funds "are not used exclusively to better the carrier's cashflow situation, but are extensively used by carriers to provide lessors with cash advances before each trip." 131 M.C.C. at 153. To accommodate this situation, the Commission modified the regulations in its final decision to provide that "[f]or purposes of calculating the balance of the escrow fund on which interest must be paid, the carrier may deduct a sum equal to the average advance made to the individual lessor during the period of time for which interest is paid." 131 M.C.C. at 153.

tioners do not seriously disagree. However, they do disagree on the particular rate of interest which the Commission set.

In its interim decision, the Commission proposed the rate be "no less than that paid by commercial banks in the city of the carrier's legal domicile." 129 M.C.C. at 742, 43 Fed.Reg. at 29817. Some of the comments received on the proposal indicated there might be some difficulty deciding what that rate is, given the various rates banks pay for different types of accounts, and the possible difficulty in determining the "legal domicile" of a large interstate trucking company. In its final rule, the Commission resolved these problems by setting the interest rate equal to that of 91-day Treasury bills.

Petitioners contend that it was unfair of the Commission to respond to complaints about indefiniteness by imposing a higher rate than that originally proposed for comment.[16] The Commission, on the other hand, justifies its decision on grounds that the Treasury bill rate is both unambiguous and uniform throughout the country, thus decreasing the likelihood of disputes over what the proper rate should be. The Commission notes, too, that because the Treasury bill rate was specifically authorized by statute in the context of railroad refunds, 49 U.S.C. § 10707(d), there is some precedent for its use.

Petitioners respond that the railroad statute referenced by the Commission sets the interest on railroad overcharges, and thus should be interpreted as a punitive rate or "penalty." However, they are unable to cite any case authority for this proposition, or any legislative history to that effect. The Treasury bill rate is, after all, the rate at which the government must borrow money. We cannot say that in setting this rate for escrow funds the Commission was being unreasonable or penalty-minded.

Again, setting the interest rate involves a balancing of concerns. Even if the result is

to charge the regulated carriers a slightly higher rate than they deem fair, the Commission can justifiably balance this harm against the benefit of having an easily determinable, uniform rate which will prevent unnecessary disputes in the future. As stated in *National Tank Truck Carriers, Inc. v. ICC*, 559 F.2d 845, 849 n.7 (D.C.Cir.1977), "Even if the ICC's regulations were to disadvantage a particular segment of the trucking industry more than others . . . that fact alone would not change their generalized nature or affect their validity." It is not for this court to upset the scales simply because petitioners disagree with their tilt.

## V. CONCLUSION

As discussed, the regulations challenged here are within the scope of the Commission's authority, and are reasonably related to the purposes of the Act. The Commission responded to a clearly stated concern of a segment of the industry, a concern strongly seconded by Congress. The course it chose to follow was well within the limits set by statute. While the regulations reallocate the burdens as between the regulated carriers and the independents, we do not believe that as a whole the final allocation was unfair. In any event, this was for the Commission to measure. We therefore affirm the Commission's order promulgating the regulations.

*Affirmed.*

---

**16.** We note that the Treasury bill rate is not intrinsically higher than commercial bank rates. Although under present economic conditions the Treasury bill rate is in fact somewhat higher, this has not always been the case historically and the situation may change again in the future.